UNITED STATES of America,
Appellee,

v.

Angelo SEIJO and Nicholas
Hildebrandt, Appellants.

Nos. 644, 681, Dockets 74–2313, 74–2436.

United States Court of Appeals,
Second Circuit.

Argued Feb. 13, 1975.

Decided April 23, 1975.

Michael A. Young (Legal Aid Society), New York City (William J. Gallagher, New York City, on the brief), for appellant Seijo; Sidney M. Offer, New York City, for appellant Hildebrandt.

Thomas M. Fortuin, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. for the S. D. N. Y., Lawrence S. Feld, Asst. U. S. Atty., on the brief), for appellee.

Before HAYS and FEINBERG, Circuit Judges and HOLDEN,* District Judge.

HOLDEN, District Judge:

Angelo Seijo and Nicholas Hildebrandt appeal from judgments of conviction entered upon jury verdicts returned on July 30, 1974, before the Honorable Lloyd F. MacMahon. The indictment, in Count One, charged Seijo, Hildebrandt, Leonard Torres and James Di Domenico with conspiracy to violate the federal narcotics laws from April 1, 1974, to June 14, 1974, in violation of 21 U.S.C. § 846. Count Two charged Hildebrandt, Torres and Di Domenico with distributing approximately 38 grams of heroin on April 11, 1974. Count Three charged Torres and Hildebrandt with distributing approximately 162 grams of heroin on April 18, 1974. All four defendants were charged with distributing 260 grams of heroin on June 5, 1974. Count Five charged Seijo with possessing, with intent to distribute, approximately 34 grams of heroin on June 5, 1974. Counts Two through Five charged violations of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A) (1970) and 18 U.S.C. § 2. Count Six charged Seijo with carrying a firearm during the commission of the felonies specified in Counts One, Four and Five, in violation of 18 U.S.C. § 924(c)(2). This count was severed prior to trial and subsequently dismissed with the consent of the Government.

On the first morning of trial, Torres pleaded guilty to Count One of the indictment and later testified for the Government. The jury found Hilde-brandt guilty on all counts. Seijo was found guilty on Counts One and Four; he was acquitted on Count Five. Di Domenico was found guilty on Counts One and Two. Hildebrandt and Seijo were sentenced to concurrent terms of fifteen years confinement with three years special parole on each count. Di Domenico was sentenced to a term of imprisonment of five years to be followed by a special parole term of three years. Torres was sentenced to a period of probation for five years on the special condition that he participate in a community narcotic treatment program. Counts Two, Three and Four were dismissed against Torres. Di Domenico did not appeal.

The essence of the Government's case against both appellants resides in the testimony of Leonard Torres. Admitting that he delivered the narcotics charged in the indictment, Torres testified Hildebrandt was his source. Seijo was depicted as the man behind the operation. During the pendency of this appeal, and about five months after the trial, the Government discovered in its files that Torres had lied to the prosecutor after he agreed to cooperate and had falsely testified at the trial in stating he had never been convicted of a criminal offense prior to his arrest in this case. Although the defense had requested this information before the trial, it was reported by the Assistant United States Attorney, in charge of the case, that Torres had no prior record. Approximately four weeks before the trial, on July 2, 1974, a Federal Bureau of Investigation criminal identification sheet was received in the office of the United States Attorney. The report set forth that Torres had a criminal record; that he was convicted in 1969 of possession of marijuana at Fayetteville, North Carolina. He received a suspended sentence of two years and was placed on probation for a four year term and fined $300. The controlling question for review is whether the undisclosed information and

---

* Of the United States District Court for the District of Vermont, sitting by designation.

Torres' false concealment of it deprived the appellants of a fair trial.

■ Since the question was not presented to the trial court, we are called upon the decide the issue on the record presented on appeal.[1] *See* United States v. Badalamente, 507 F.2d 12, 18 (2d Cir. 1974), cert. den. —— U.S. ——, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975). In measuring the likely impact of the suppressed material, it is important to first consider the strength of the Government's case apart from the evidence given by Torres.

Detective Joseph Scamardella of the New York City Police Department was assigned to the Drug Enforcement Task Force. On April 10, 1974, Scamardella, posing as a heroin dealer, was introduced by a police informant named Tom Frano, to James Di Domenico and Leonard Torres. The introduction was effected to enable Detective Scamardella to purchase heroin. Torres and Di Domenico told Scamardella that their "source" had an eighth kilogram of heroin for another purchaser, but his man was unwilling to break it up to sell a half ounce. Detective Scamardella informed Torres that he would take a full ounce,—"to see what the stuff was like." A further meeting was set up for the following day, April 11th. The second meeting was in Scamardella's automobile; Frano was his passenger. They were joined by Torres and Di Domenico, who delivered 14 grams of heroin and received $600 in recorded currency.

A week later, on April 17, 1974, Scamardella telephoned Torres requesting another purchase of heroin. A meeting on April 18th, in the Bronx, resulted in the delivery of a package by Torres of 122 grams of heroin in return for $4,900 in cash. Detective Arthur Drucker, who had maintained surveillance of the transaction, followed Torres to Neckles Beach Bar in the Bronx. Torres emerged from the bar in conversation with appellant Nicholas Hildebrandt. Both returned to the bar and after a short interval Torres departed. Detective Drucker followed Torres' car, but later lost it.

On the following day Detective Scamardella called Torres again in an effort to purchase one and one-half kilograms of heroin. Torres informed him that his "man," mentioning the word "Nick," would be willing to sell a half pound. No sale resulted.

On June 3, 1974, Scamardella called Torres again, seeking to purchase two packages of heroin, of an eighth kilogram each. The following day Torres agreed to supply the two packages for $9,200. On June 5, Scamardella proceeded to a meeting with Torres at Howard Johnson's Restaurant, located near the Bronx Zoo. Torres, after a telephone call, informed Scamardella that in fifteen minutes they could leave the restaurant and then pick up the narcotics. Scamardella, not wanting to disrupt the surveillance, resisted the move on the pretext that he didn't want to carry $10,000 in cash to another location. He requested Torres to deliver the packages to him at the restaurant. Torres agreed, but went on to say he would have someone with him, for protection, when he returned.

An hour later Torres returned in a yellow Toyota, which he parked a block away from the restaurant. He was followed by a Chevrolet which was occupied by appellants Hildebrandt and Seijo. They parked two car lengths from the Toyota. Torres approached the Chevrolet and talked to the occupants. Torres returned to the Toyota, removed a brown paper bag and motioned to Seijo. On Torres' signal, Seijo got into the Toyota, made a U-turn and drove at slow speed behind Torres, as he walked to-

1. Without pressing the point, the Government suggests in the margin of its brief that the appellants should have moved for a remand to the trial court for the disposition of their claim under Rule 33, Fed.R.Crim.P., by way of a motion for a new trial on the ground of newly discovered evidence. The material upon which the appellants rely was uncovered long after the notices of appeal had been filed. From the record on appeal, we see no useful purpose to be served by a remand.

ward the restaurant parking lot. There Torres approached Scamardella, who was seated in his parked car. Torres delivered the paper bag to Scamardella, who then got out of his car to remove the money from the trunk of his vehicle. In so doing, he signalled the surveillance team that he had the package. As he gave the money to Torres the officers standing by moved in and arrested Torres and Scamardella. The paper bag contained 217 grams of heroin. The appellant Hildebrandt was arrested in the Chevrolet parked a short distance away from the restaurant. The appellant Seijo was arrested in the Toyota which he had parked headed in and against a retaining wall in the restaurant parking area.

Seijo was removed from the Toyota, told to place his hands on the top of the vehicle. In this posture Seijo was frisked, handcuffed and ordered into the left side of the rear seat of a two-door police car. Shortly thereafter Torres was brought to the same vehicle and seated on the rear passenger side. Seijo was observed by one of the police officers to be moving about in the rear seat; he informed the arresting officers that his handcuffs were too tight. Seijo was taken out of the car and the rear seat was removed. A small package of heroin, identified and received in evidence as Government's 4, was retrieved from the area under the left rear seat. Count Five charged Seijo alone with the possession of the package found in the police car and he was acquitted of this charge.[2]

On the morning following the arrest, Hildebrandt, under questioning by Detective Drucker, stated his source of supply was one Dominick Lessa.[3] He described the exclusive method of contact with Lessa. There was no implication of the appellant Seijo in Hildebrandt's statement. Although this testimony indicates Hildebrandt was involved in narcotic traffic, there is no evidence to connect his dealings with Lessa to the narcotics delivered by Torres to Scamardella.

The Government's chemist testified that the substance which Torres delivered to Detective Scamardella on April 11, 1974, and June 5, 1974, matched the composition of the heroin seized from Di Domenico and that found under the rear seat in the police vehicle.

Such is the sum and substance of the Government's proof against the appellants, taken separate and apart from the testimony of Leonard Torres. His testimony provided the only evidence to connect the appellants with the deliveries Torres made to Detective Scamardella.

At the time of trial Torres was twenty-four years old. He testified he first became involved with narcotics while serving in the Army in Vietnam in 1969. He became addicted to opium at that time. In 1970, at Fort Bragg, North Carolina, he received an honorable discharge. After returning to his home in the Bronx, Torres became addicted to heroin to the extent of using, by injection, two or three bags daily. He testified he was not using drugs at the time of his arrest; that he had become a participant in a methadone program in January, 1971 and continued with it at the time of his arrest and during the trial.

Torres testified that he knew Frano and Di Domenico through the methadone program. Frano had asked him if he could supply him with heroin. Torres replied he would find out. Later the defendant Di Domenico told him that Frano had made the same request of him. Torres and Di Domenico agreed to "see if we could get him (Frano) something." According to Torres' testimony they drove to the appellant Hildebrandt's

---

**2.** As stated above, the jury acquitted the appellant Seijo of possessing this package which was the subject of Count V. In so doing, they apparently rejected Torres' testimony that earlier in the day he saw Seijo put a small package, 4½″ in length, in his front pants pocket.

**3.** There was no identification of Lessa at the trial. The Government's brief reports that a bench warrant for Lessa's arrest was issued on January 21, 1973, when he failed to appear for trial. Apparently he continued to be a fugitive at the time of trial.

home, where the transaction was arranged, and delivery was made to Detective Scamardella.

Thereafter, in response to a telephone call from Detective Scamardella, Torres testified he met with Hildebrandt at Neckles Beach Bar to arrange the sale of an eighth kilogram of heroin for $4,900 on April 18, 1974. Torres testified he picked up the narcotics for this deal at Hildebrandt's home and returned the purchase price to Hildebrandt. According to Torres, he received none of the proceeds of this transaction.

The most damaging aspect of Torres' uncorroborated testimony, as it relates to the appellant Seijo, derives from his narrative concerning Frano's subsequent request for three ounces of heroin. Torres stated he obtained the three ounces from Hildebrandt; one in payment for his services in the prior sale, and two ounces for Frano, which Torres said he received on consignment. Torres testified he turned the three ounces over to Frano; but Frano disappeared and has not been found. Hildebrandt informed Torres he was responsible for the two ounces consigned in the amount of $2,400 and insisted on payment. Later, according to Torres, in the middle of May, Hildebrandt requested Torres to go to Neckles Beach Bar, where he met with Hildebrandt and Seijo. Both appellants asked Torres when he was going to come up with the money. According to Torres, Seijo told him—"Listen, I'm the guy behind the whole thing. I lent Nick all this money, and I want to be paid for it." Later Seijo threatened—"I'll kill you. I'll kill your mother and father all the way up ane down the line. I'll throw them in the bay in back, if you don't give me my money."

Torres testified that about two weeks later Detective Scamardella asked him if he could get him two, eighth kilogram packages of heroin. Torres went to Hildebrandt at the Neckles Beach Bar. He talked only to Hildebrandt, but Seijo was sitting at the bar next to him. Hildebrandt agreed to supply the heroin. When Scamardella called again the meeting at Howard Johnson's was set up for June 5, 1974. Torres testified that at the first meeting at the restaurant he had two friends with him, "Pooch and John" who accompanied him for protection. They were parked across the street.

Torres testified he called Hildebrandt at the Neckles Beach Bar. Hildebrandt directed Torres to proceed to that location. "Pooch and John" followed, but Torres dismissed then en route.[4] Torres did not tell his friends that he was dealing in narcotics. Torres continued on to Neckles Beach Bar. Hildebrandt was not there so Torres called him at his shop. According to Torres, Hildebrandt and Seijo met him in front of the shop where Torres received the heroin from Hildebrandt. Hildebrandt and Seijo followed Torres to the restaurant. Torres testified that Seijo never handled the package that was delivered to Scamardella. However, he stated that earlier in the day he saw Seijo put a smaller package in his pants pocket.

At the conclusion of his direct testimony Torres was asked by counsel for the Government:

Q. Other than when you were arrested on that night, June 5, 1974, have you ever been arrested before?

A. When I was—when I was a kid we took bats and balls out of a park house.

Q. And were you arrested for that?

A. Yes.

Q. What was the result of that charge? Were you convicted?

A. No. We were dismissed you know. Our parents had to come in and, you know, they said that we would be in their custody and every-

---

**4.** "Pooch and John" were not identified by Torres. No explanation was given as to why they were released at this stage of the transaction and before the payment, they were as-
signed to protect, had been made. At one point in the testimony Torres referred to one of these friends as "Nick," when he dismissed them, prior to his return to Howard Johnson's.

thing. This is before I was 16. I think I was 14, 15 years old.

Torres was asked on cross examination concerning his involvement with drugs:

Q. Did they ever pick you up in the Army for using—

A. No, sir.

Q. They never picked you up in the Army for using drugs?

A. No, sir.

Q. All right.

This testimony was untrue. At the time it was given, as will later appear, its falsity, although known to Torres, was unknown to the Assistant United States Attorney who conducted the trial.

Seijo testified in his own dfense; Hildebrandt did not. Seijo had no prior arrests or convictions. He testified he did not use drugs. He knew the appellant Hildebrandt through the latter's marriage to Mrs. Seijo's cousin; however, he denied any knowledge that Hildebrandt was engaged in narcotic traffic. Seijo testified that he worked on a row boat he had purchased for his son at a boat yard in the vicinity of Neckles Beach Bar on June 5, 1974. He worked with Charles Albrecht, who operated a charter fishing boat.[5] At various intervals he worked with Hildebrandt, whose boat was also undergoing repairs.

When the boat work was finished the three entered Neckles Beach Bar to drink beer, visit and view television. About eight in the evening Torres arrived and conversed with Hildebrandt out of Seijo's hearing. After Torres' departure Hildebrandt informed Seijo that Torres had offered to pay each of them $25.00 if they would accompany Torres, for protection, while he attempted to collect some money that was owed him.[6] With Seijo driving, they gave Albrecht a ride toward his home. After discharging

Albrecht at Pelham Parkway the apppellants proceeded to a bar nearby Hildebrandt's sewing shop. After Hildebrandt left the car, to talk with Torres, the appellants followed Torres to the vicinity of the Howard Johnson Restaurant, where they parked the Chevrolet behind Torres' Toyota. Torres asked Seijo to drive the Toyota into the parking lot while Torres went on foot to meet the person who was to bring him the money. Hildebrandt remained in the parked vehicle, partly asleep from having had too much to drink. Seijo observed Torres remove a package from the Toyota and then walk toward the parking lot. Seijo entered the Toyota and made a U-turn. According to his testimony, he reached the parking lot and parked the vehicle. From this point he observed Torres enter a white car, where the delivery of the package to Detective Scamardella was accomplished. Seijo was immediately arrested, frisked and placed in the rear of a police car that had pulled alongside the Toyota.[7]

Seijo denied he had ever threatened Torres. He disclaimed that he had financed any of Hildebrandt's alleged narcotic operations. He testified Hildebrandt never told him he was involved in narcotics traffic and he never saw Hildebrandt give Torres any narcotics. He denied having Government Ex. 4 in his possession.

In summation, the Government characterized Torres as the "kid" less familiar with the ways of the street than his co-conspirators. "He was younger, he was innocent." The jury was called upon to consider his prior record and his arrest at 16 for stealing baseballs, while the record of one of his co-conspirators indicated he "dealt with guns rather than baseballs." The Government stressed Torres' military service. With

---

**5.** Albrecht's testimony corroborated Seijo's concerning the events prior to the arrest.

**6.** This is consistent with Detective Scamardella's testimony that Torres told him, as he left the restaurant, that he would have someone with him for protection on his return.

**7.** At the time of arrest, Seijo had $1.56 in his pocket, which was removed and recorded by the arresting officers. Government's Exhibit 4 was not discovered at this time.

respect to Seijo, the Government argued —"it comes down to who do you believe" —Seijo or Torres.

On December 17, 1974, after notice of appeal had been filed, Thomas M. Fortuin, Esq., the Assistant United States Attorney who tried the case, filed an affidavit with the court in which he reported that he had recently discovered the Federal Bureau of Investigation criminal identification sheet referred to earlier in the opinion. Although the identification sheet indicated that it had been received by the United States Attorney's office on July 2, 1974, through an error in a notation on the index card, the document was directed to the Chief of the Criminal Division. Since the Torres case had previously been assigned to Assistant United States Attorney Kaufman, the identification sheet was returned to the file room, where it remained until December, 1974.

The affidavit further showed that prior to the discovery of Torres' conviction record in December, neither Mr. Fortuin nor Assistant United States Attorney Kaufman knew of this prior conviction.[8]

■ We are not confronted with any intentional suppression on the part of the Government, of evidence favorable to the defendant. Indeed, the record indicates the Assistant United States Attorney, responsible for the prosecution, made known the falsity of Torres' testimony as soon as it was communicated to him. Although those representing the Government acted in good faith, that does not conclude the question. One concern is the possible effect the evidence withheld might have had, if it had been available to the defense at the time of trial.

> (T)he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215.

We recognize that some shadow was cast on Torres' testimony at the instance of the Government. He was cross-examined at length. He admitted that he pleaded guilty to only one of the four counts in the indictment, reducing the possible maximum sentence from 60 to 15 years; that he hoped his cooperation with the Government would be of assistance to him at his sentencing. He also admitted that he had used opium, that he had been addicted to and had sold heroin; that at the time of the trial he was taking methadone. The import of past possession of marijuana pales in comparison with Torres' extensive involvement with "hard" drugs. However, the false denial by Torres on the witness stand of his prior conviction has a different and more serious bearing. In this aspect, it cannot be said to constitute merely cumulative impeaching material.

Although the Government argues that Torres' testimony in denial of any conviction, other than the juvenile offense, was not material to the guilt or innocence of the appellants, it is entirely clear that his testimony was false. His denial in cross-examination of ever having been arrested during his military

---

8. This information was furnished to the court by letter of February 20, 1975, in response to a directive by the panel made during oral argument. These facts are in addition to those set forth in the affidavit to that effect after Torres agreed to cooperate. He told Mr. Fortuin that he had never been convicted of a crime prior to his arrest in this case. When defense counsel requested a copy of Torres' "rap sheet" before trial, Mr. Fortuin asked the police officers of the New York Drug Enforcement Task Force, assigned to the case, to determine whether Torres had a criminal record. The officers had checked with the New York State Bureau of Criminal Identification, but records of that agency did not reveal the out-of-state arrest or conviction. These officers informed Mr. Fortuin that they had checked and Torres had no prior convictions. The Government, through Mr. Fortuin, informed defense counsel that Torres had no prior convictions. Apparently no effort was made at this time to recheck Torres' record with the F.B.I., although the Government had resorted to this agency for this particular information before Torres had agreed to cooperate.

service for using drugs was consciously untruthful. Unlike Di Domenico, the fabric of the Government's case against Seijo and Hildebrandt was such that Torres' credibility was the decisive factor. The identification sheet in the Government's possession had the capability of demonstrating that his past criminal conduct was more serious than that of a youthful delinquent. Of greater importance, it is persuasive that his false and conscious concealment of the prior conviction renders the uncorroborated substance of his testimony suspect. Perhaps the North Carolina conviction, had it been disclosed at the trial, would not have seriously damaged Torres' credibility. However, his false concealment of any criminal record in his adult life generates doubt concerning the rest of the evidence he delivered against the appellants.

■ Of course, we are mindful that a new trial is not called for at every instance where ". . . a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . ." United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968). Yet when the reliability of a particular witness may be determinative of innocence or guilt, a "new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

■ Where, as here, there was neglect, rather than prosecutorial miscon- duct, a higher standard of materiality is required. In this posture, the test—"is whether there was a significant chance that this added item, developed by skilled counsel . . . could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." United States v. Sperling, 506 F.2d 1323, 1333 (2d Cir. 1974), United States v. Miller, 411 F.2d 825, 832 (2d Cir. 1969).

■ Applying the test stated in *Miller*, as followed in this circuit,[9] we are persuaded that despite the presence of other impeaching material available to the jury, Torres' prior conviction and his false concealment of this fact, had it been known to the jury, would have exerted a compelling impact on his credibility as to the unsubstantiated aspects of his testimony. Had the jury known that Torres responded untruthfully, the exposure could have created a sufficient doubt in the minds of enough jurors to affect the result. United States v. Miller, *supra*, 411 F.2d at 832.

The taint of Torres' false testimony is not erased because his untruthfulness affects only his credibility as a witness. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence . . . ." Napue v. Illinois, *supra*, 360 U.S. at 269, 79 S.Ct. at 1177. It is so here; the jury was squarely faced with the hard question of whom to believe. *See* United States v. Badalamente, *supra*, 507 F.2d at 15.

Had the source and subject of Torres' untruthfulness on direct examination been disclosed and developed at the trial, the appellants' fate may well have been differently decided. Although the true

---

9. *See* United States v. Pacelli, 491 F.2d 1108 (2d Cir. 1974), cert. denied, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974); United States v. Mayersohn, 452 F.2d 521 (2d Cir. 1971); United States v. Houle, 490 F.2d 167 (2d Cir. 1973), cert. denied, 417 U.S. 970, 94 S.Ct. 3174, 41 L.Ed.2d 1141 (1974); United States v. Pfingst, 490 F.2d 262 (2d Cir. 1973), cert. denied, 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974); United States v. Fried, 486 F.2d 201 (2d Cir. 1973), cert. denied, 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 759 (1974); United States v. Kahn, 472 F.2d 272 (2d Cir. 1973), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); United States v. Bonanno, 430 F.2d 1060 (2d Cir. 1970), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970).

*See also*, United States v. Badalamente, 507 F.2d 12 (2d Cir. 1974), cert. denied, —— U.S. ——, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975); United States v. Polisi, 416 F.2d 573 (2d Cir. 1969); United States v. Keogh, 391 F.2d 138 (2d Cir. 1968).

answer to the precise question must remain unknown, enough is established in the record presented to demonstrate that the material withheld sufficiently touches upon the constitutionally protected rights of the appellants and impairs the validity of the verdicts returned against them.

While the Government case against Hildebrandt appears somewhat stronger than that presented against Seijo, the verdicts returned in both instances were similarly composed in the proof. Both convictions are essentially predicated on the now suspect credibility of the crucial witness Torres.[10] We find no occasion to further allocate nor compare the substance of the proof as to the respective appellants.

Since new trials are required, we are not called upon to consider the challenges advanced by the appellant Seijo concerning the validity of his sentence.

The convictions are set aside and new trials ordered as to both appellants.

---

10. In drawing this conclusion, the court is mindful of the emphasis in the Government's closing argument on Torres' "truthful" testimony.