Herman BELL, Anthony Bottom and Albert Washington, Petitioners,

v.

Thomas A. COUGHLIN, III, Commissioner, New York State Department of Correctional Services; Louis Mann, Superintendent, Shawangunk Correctional Facility; Charles Scully, Superintendent, Greenhaven Correctional Facility; and Dominic Mantello, Superintendent, Wende Correctional Facility, Respondents.

No. 89 Civ. 8408(MEL).

United States District Court, S.D. New York.

May 10, 1993.

grant a preliminary injunction under the Lanham Act.

Lawrence A. Vogelman, Barry C. Scheck, Ellen Yaroshefsky, Cardozo Criminal Law Clinic, New York City by Joanne Richardson, Roy Wallace, Law Students, Brian Glick, New Rochelle, NY, Michael Spiegel, Bronx, NY, Jedidiah Alpert, Judith M. Rosen, Dechert Price & Rhoads, New York City, for petitioners.

Robert M. Morgenthau, Dist. Atty. for New York County, New York City, for respondents; Mark Dwyer, Marc Frazier Scholl, James J. Troy, Asst. Dist. Attys., of counsel.

LASKER, District Judge.

On May 12, 1975, Herman Bell, Anthony Bottom, and Albert Washington were found guilty of the May 21, 1971, premeditated murder of Joseph Piagentini and Waverly Jones, officers of the New York City Police Department ("NYPD"). This petition for habeas corpus relief raises two issues relating to the ballistics evidence in the case: (a) whether the prosecution failed to correct testimony which it knew, or should have known, was false, and (b) whether it withheld exculpatory FBI ballistics evidence in its possession.

In 1982 in response to requests made under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1982), petitioners obtained a copy of an FBI ballistics report, dated September 13, 1971, which had not been disclosed to them at trial. After exhausting their state remedies, petitioners filed the present petition for a writ of habeas corpus in 1989. On November 18, 1991, 778

F.Supp. 164, this Court dismissed the petition with respect to all of the claims except the ballistics claim described above. With respect to that issue, it was decided that petitioners were entitled to an evidentiary hearing, which has now been concluded.

I find that material favorable to the defense was not disclosed and that a prosecution witness did commit perjury, but that these serious defects did not have a material impact on the outcome of the trial.

Accordingly, the petition is denied.

## I.

On the evening of May 21, 1971, Officers Waverly Jones and Joseph Piagentini were gunned down as they emerged from a housing project in Upper Manhattan where they had been responding to a routine call. On August 28, 1971, in the first big break in the case, two men—arrested in San Francisco in connection with a separate crime—were found in possession of the service revolver of one of the murdered police officers. (The service revolvers of both of the officers had been missing since the date of the murders.)

Some three months later, the New York District Attorney's office presented evidence to a Grand Jury seeking an indictment against petitioners Bottom and Washington for the Jones/Piagentini murders. Two facts stood out in the District Attorney's presentation: (a) the defendants' possession of the service revolver of Officer Waverly Jones, and (b) their possession of a .45 caliber pistol which, according to the prosecution's ballistics expert, was one of the murder weapons.[1] Twelve pieces of .45 caliber ballistics evidence were found at the scene of the crime and in autopsies of the murdered officers— six bullets and six cartridge shells.

The proof relating to the identification of the .45 caliber pistol found in Bottom and Washington's possession as a murder weapon is the crux of this petition.

The People contended that the Colt .45 automatic pistol found in Bottom and Washington's possession at the time of their arrest was one of the murder weapons. At the

---

1. The guns were found in the car in which Bottom and Washington were arrested.

trial, the sole proof on this issue was the testimony of Detective George C. Simmons, the NYPD ballistics expert assigned to the investigation. The defense did not present any experts or conduct any ballistics tests of their own to counter Simmons' testimony, and, in fact, conceded the identification of petitioners' gun as a murder weapon in their closing argument:

> Two men are arrested in California, Mr. Bottom and Mr. Washington, and they have the misfortune of having in their possession *a .45 caliber weapon that was used to shoot the two police officers* and a .38 caliber weapon that one of the police officers had in his possession on the night of May 21st.

(Tr. 8926, Bell's Closing Argument) (emphasis added).[2]

The ballistics tests at issue involve microscopic comparisons of markings left on bullets and cartridge shells test fired from the suspect weapon against markings on bullets and cartridge shells recovered from the bodies or the scene of the crime.

At trial, Simmons testified that on September 23, 1971, he flew to San Francisco to test fire the .45 caliber pistol and compare the test-fired ammunition with the evidence from the homicides in his possession. He stated that he took all of the .45 caliber ballistics evidence in the case—6 bullets and 6 cartridge shells—with him to San Francisco. (Tr. 5755, 5760–61). He also stated that he made positive matches with respect to nine of the twelve pieces of evidence and suggested that, with respect to the other three pieces, no identification was possible because those pieces were "too deformed" to test. (Tr. 5761–62).

The clear thrust of Simmons' testimony was that these were the only ballistics tests run on the San Francisco gun although he never stated this in so many words. Simmons testified on cross examination at trial:

Q. Prior to your doing that on the 24th of September, do you know of any other expert, either yourself or anyone else from the New York City Police Depart-

ment or someone from San Francisco, performed a similar test, either in San Francisco or New York?

A. I don't know to my knowledge.

Q. Have you ever seen a report that would reflect that?

A. I don't recall.

Q. Was there any request to your knowledge, any of the material from the scene, that would be from either the hospital or Colonial Park Houses, be sent by New York out to San Francisco for any reason?

A. No.

Q. Not that you know of?

A. I would take it.

Q. So do we understand that the first day that, so far as you understand, that there was a positive comparison between, let's call it the San Francisco material and May 21st material, was the day you went out there and performed the test?

MR. TANENBAUM:

Judge, I object to that. Mr. Bloom is talking about material. Does he mean the .45 and ballistics found at the scene? If that's what he means I have no objection to the question.

THE COURT:

Yes.

MR. BLOOM:

Is that right?

THE COURT:

He's talking about the first time there was a *match-up between the bullets found May 21st and the gun found August 28th.*

MR. BLOOM:

That's right.

Q. So far as you know, it was the 24th of September when you, yourself, did it?

A. Yes, best of my recollection.

(Tr. 5775–76). However, as the People have conceded, ballistics tests were run on the .45 caliber gun found in Bottom and Washington's possession on at least two other occa-

---

**2.** "H." numbers in parentheses indicate citations to the minutes of the hearing held June 26 and 29, 1992. "Tr." numbers indicate pages from the transcript of the trial.

sions: (a) on September 7, 1971, by the FBI forensics laboratory in Washington, D.C., and (b) on September 7, 1971 (and perhaps also on September 8, 1971) by the NYPD in New York City.

The People dispute the occurrence of the NYPD's September 7 and 8, 1971 tests, but the petitioners' evidence is sufficient to establish the fact. At the evidentiary hearing, Simmons stated that, he had no present recollection of the tests he conducted on September 7 and 8, 1971, but he assumed he must have conducted them because it was his usual practice to conduct ballistics tests "immediately" upon receiving test firings from a suspect weapon. Simmons testified on direct:

> Q. Looking at that document though given your practices as they existed in 1971 does that document lead you to believe that you may have made a prior comparison? [i.e., prior to the September 24, 1971 test]
>
> A. Yes.
>
> Q. And what about that document leads you to that conclusion?
>
> A. The dates, when I got the evidence I immediately checked it.
>
> Q. You would have immediately checked it?
>
> A. Yes.
>
> Q. It's test-firing from a suspect weapon?
>
> A. Yes.

(H. 280). Four sets of bullets and cartridge shells test fired from the San Francisco gun were received by Detective Simmons on September 7, 1971, and an additional set of test firings was received by him on September 8, 1971. There is no dispute about the occurrence of the FBI tests on September 7, 1971.

In addition, the three pieces of .45 caliber ballistics evidence which Simmons stated were too deformed to test, were not too deformed. At trial Simmons testified on direct examination:

> Q. Were all those .45 shells, bullets that you have in front of you and discharged shells, fired from that .45 pistol as you indicated?

> A. *Only certain ones I could identify as positively. Some of them were too deformed.*
>
> Q. And you indicated that the two .45 bullets marked J/R–1 and J/R–3 that came from Waverly Jones' body definitely came from that .45?
>
> A. Yes.
>
> Q. And one of the .45 bullets taken from Joseph Piagentini's body marked PU–3, you indicated came from the .45?
>
> A. Yes.
>
> Q. And a bullet marked C–3 found by Detective Cunningham at the scene also came from that .45?
>
> A. Yes.
>
> Q. And the bullets [sic, shells] found by Detective Butler, with the exception of B–3, also came from that .45?
>
> A. Yes.
>
> Q. Did they come from any other gun other than that .45?
>
> A. No.

(Tr. 5761–62) (emphasis added). Three pieces of ballistics evidence are missing from the above catalogue of evidence:

** A bullet marked J/R2 taken from the body of Waverly Jones

** A bullet marked J/R4 also taken from the body of Waverly Jones

** A cartridge shell marked B3

Accordingly, Simmons' testimony must be taken to mean that he made positive matches with respect to nine of the twelve pieces of .45 caliber ballistics material, and that, with respect to J/R2, J/R4 and B3, he was unable to make a positive identification because they were too deformed to test. (Six .45 caliber bullets were recovered: four from Waverly Jones' body, one from Joseph Piagentini's body and one from the scene of the crime. J/R2 and J/R4 were two of the bullets recovered from Officer Jones' body. B3 was one of the six .45 caliber cartridge shells recovered from the scene of the crime.)

However, a June 8, 1971 FBI Lab internal memorandum states that both J/R2 and J/R4 were testable:

Specimen [J/R2] bears sufficient individual microscopic characteristics for comparison with suspect weapon.

Specimen [J/R4] bears few individual microscopic characteristics of value for comparison but the nature of these marks warrants comparison of this bullet with suspect weapons.

(Pet. Hearing Exh. 209). Furthermore, in late May 1971, the FBI Lab compared J/R2, J/R4 and B3 against "all specimens of similar types in the National Unidentified Ammunition File and with all other specimens currently in the [FBI] Laboratory which logically should be compared with these specimens," (Pet. Hearing Exh. 206 and 209),— something it is unlikely the Lab would have done if J/R2, J/R4 and B3 were really "too deformed" to test. In addition, as noted above, the FBI Lab ran microscopic comparisons of those three pieces of evidence on September 7, 1971, and nowhere in its September 13, 1971 report as to these tests is it indicated that these pieces were too deformed to test. Finally, at the evidentiary hearing, Simmons himself backed away from his trial testimony, stating:

Q. Do you remember telling anybody ever that J/R2, J/R4 and B3 were too deformed to be used for comparison?

A. No, I don't recall it, no.

(H. 303).

It appears that the actual reason why Simmons was unable to test J/R2, J/R4 and B3 on September 24, 1971, was because they were not in the NYPD's possession at that time. The parties have stipulated that the FBI was in possession of these three pieces of evidence between August 10, 1971 and March 13, 1972. (Petitioners Bottom and Washington were arrested on August 28, 1971.) Accordingly, the NYPD was not in possession of J/R2, J/R4 and B3 on the date that Simmons conducted his San Francisco tests (September 23, 1971) or on the date that Simmons testified before the Grand Jury (November 18, 1971). Moreover, the parties have stipulated that Simmons was the person who signed out the three pieces of evidence to the FBI and who signed them back in. One can only conclude that in the circumstances Simmons must have been aware that on September 23, 1971 he did not have the bullets in his possession.

The People contend that Simmons "left open the possibility" that other .45 caliber weapons were used in the homicides. However, Simmons specified that only one .45 caliber weapon was used in the murders:

Q. Now, were you able to determine from all of the ballistics evidence that you saw, that you have in front of you, how many weapons were actually used in this case?

A. Three.

Q. Could you tell us what the caliber of the weapons was?

A. One .45 and two .38's.

Q. Is that the .45 in front of you one of the murder weapons in this case?

A. Yes.

(Tr. 5762).

\*        \*        \*

According to the People's evidence at trial, Washington, Bell, Bottom, and Francisco Torres, arrived in New York from California in early May 1971. Petitioners regularly met with Francisco Torres, his brother Gabriel Torres, Gabriel's wife Linda Torres, Jacqueline Tabb, and Karen Parks, at the house of Gabriel Torres, to talk about "radical politics" during that month. Rubin Scott testified that in the spring of 1971 he received a message from the defendants to ship two guns to them and that in response to this request, he shipped a .45 caliber automatic pistol and a .38 caliber pistol to the defendants in New York City. Tabb testified that the petitioners had conversations about "scoping pigs" and after the murders listened to the news reports of the killings and boasted that they had committed them. Moreover, two eyewitnesses to the murders, identified petitioner Bottom as being one of the three men who opened fire on Jones and Piagentini. In addition, one of those eyewitnesses also testified that, before the shooting began, one of the killers had leaned against a Mustang parked in front of the building. That car was processed for latent fingerprints, and, at trial, the People presented evidence that the fingerprints were Bell's.

Finally, there was testimony by Rubin Scott that he had watched Bell bury a gun, which Bell had described as "hot," on Bell's grandfather's farm in Mississippi. Scott accompanied law enforcement personnel to the farm to locate the gun which they did, in fact, find. The police identified the gun as Piagentini's service revolver which had been missing since the date of the murders.

On the other hand, the defense presented evidence that: Rubin Scott had been subjected to torture, threats, and bribes, by the police, and that he recanted his testimony a few weeks before trial although he readopted it prior to trial. Three of the five eyewitnesses did not recognize any of the petitioners and the other two only identified petitioner Bottom. Tabb, Parks and Torres were kept in jail under outsize bail, interrogated for hours without an attorney, recaptured after they once escaped, and then released after they finally capitulated and provided the testimony the police wanted to hear.

\* \* \*

Petitioners argue that their constitutional rights were violated because the People presented Simmons' perjured testimony at trial and because the FBI ballistics report, dated September 13, 1971, was exculpatory and should have been made available to them as discoverable material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## II.

█ The suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material either to guilt or punishment irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). At the evidentiary hearing in this Court, petitioners proved that on at least two occasions (the September 7, 1971 test by the FBI and the September 7 and 8, 1971 tests by the NYPD), ballistics tests were conducted on the San Francisco gun which were not disclosed to the defense. Under *Brady,* peti-

tioners are required to prove that the undisclosed evidence was material, exculpatory and known to the prosecution.

*Were the undisclosed test results exculpatory?*

█ There is no evidence of the results of the NYPD's September 7 and 8, 1971 tests. At the evidentiary hearing in this Court, Simmons testified that he could not recall telling anyone of the results of these tests. (H. 328) In addition, he stated that he could not recall conducting the tests but assumed that he must have done so because it was his usual practice to conduct tests "immediately" upon receiving test firings from a suspect weapon (H. 280), and that the results must have been positive. Simmons testified on direct:

Q. Sir, based upon your examination of that test-firing envelope do you believe that you made a positive match between the test-firing given to you by Tumulty and the evidence from the homicide prior to going to San Francisco?

A. Yes.

(Tr. 284–85). Petitioners contend that it is not credible that Simmons would have forgotten a positive match or neglected to make a record of such a result when identification of the .45 caliber pistol as a murder weapon constituted one of the most important breakthroughs in the case. However, this argument, while not unreasonable, is largely speculative. In the absence of more substantive proof, and, in light of Simmons' credible testimony at the evidentiary hearing, there is an insufficient evidentiary basis for concluding that the results of the NYPD's September 7 and 8, 1971 tests were negative. Accordingly, for purposes of this petition, it is assumed that the NYPD test results were positive.

█ The results of the FBI tests were mixed. The lab positively matched a cartridge shell (B3) to the .45 caliber pistol but reported that no conclusion could be reached with respect to the two bullets (J/R2 and J/R4) in its possession.[3] (Pet. Hearing Exh.

---

**3.** The Lab explained its inconclusive findings with respect to J/R2 (a bullet) as "possibly due to changes through use in the barrel of the weapon

... subsequent to the time [that the bullet] was fired," and its inconclusive findings with respect to J/R4 (also a bullet) as "possibly due to the fact

225). Thus, although the results of the FBI tests may be characterized as mixed, they clearly contained exculpatory material.

*Did the prosecution have knowledge of the FBI test results?*

■ Petitioners contend that the prosecution knew, or should have known about the FBI test results. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (holding that "whether [a *Brady* ] nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor"). The prosecution team was in possession of the September 13, 1971 FBI ballistics memorandum, reporting on the Lab's September 7, 1971 tests on the San Francisco gun, at the time of trial. That report was contained in a 108 page document called a Letterhead Memorandum ("LHM"), prepared by the FBI on September 29, 1971, which summarized the FBI's investigative findings to that date. In the discovery proceedings in this Court, five copies of that LHM were found in the prosecution's trial files. Petitioners assert that "[t]he prosecution's copies of the LHM are well-thumbed, have been taken apart and reassembled, have been photocopied, and generally bear all of the indicia of well-used source documents." They concede that the ballistics report was buried at pages 72a and 72b of the report but point out that the front page of the LHM, in a synopsis of the LHM's contents, prominently lists "FBI ballistics results," and note that page 68 of the LHM was marked as a trial exhibit by Assistant District Attorney Robert Tanenbaum, the lead prosecutor in both the first and second trials. Petitioners also argue that numerous NYPD officers and FBI agents with whom Tanenbaum worked, and with whom Tanenbaum had opportunities to discuss the FBI's ballistics tests, knew of the FBI's examinations, and must have discussed them with him, but they have failed to provide any evidentiary support for this contention. On the basis of these facts, which is their sole proof on the issue, petitioners argue that the prosecutors must have known about the FBI test results.

that lead bullets and metal jacketed bullets are not comparably marked as they pass through the

In response the People have submitted affidavits of each of the four prosecutors who worked on the trial of the case, stating unconditionally that they were unaware at the time of trial of the FBI reports or the information which they contained. (Resp. Petition Exh. HH). None of the prosecutors was called to testify at the evidentiary hearing. The circumstantial nature of the evidence upon which the petitioners depend, when opposed by the categorical denial under oath of the four prosecutors is insufficient to establish that the prosecutors had knowledge of the report.

*Were the FBI ballistics test results "material"?*

■ Even assuming that the prosecutors knew of the FBI test results, the failure to disclose *Brady* material constitutes a due process violation only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (Blackmun, J.) (plurality opinion); *id.* at 685, 105 S.Ct. at 3385 (White, J., concurring in judgment). As the Court of Appeals of this Circuit recently stated:

> A reasonable probability in this context means " 'a probability sufficient to undermine confidence in the outcome,' " one that might make the difference between a verdict of guilt and innocence.

*Tinsley v. Kuhlmann*, 973 F.2d 163, 166 (2d Cir.1992) (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383). Given the weight of the evidence against the petitioners, described above (including, for example, the discovery of the Officer Jones' service revolver in the possession of Bottom and Washington and the discovery of Officer Piagentini's service revolver on Bell's grandfather's farm), the mixed nature of the FBI results, and the "inconclusive" aspect even of its exculpatory findings, petitioners have failed to establish a "reasonable probability" that disclosure of

barrel of a weapon."

the September 13, 1971 FBI ballistics report would have resulted in a different outcome.

## III.

*Was there perjury?*

■ Detective Simmons made false statements at trial when he (a) testified that he did not have J/R2, J/R4, and B3 with him on his trip to San Francisco, (b) denied knowing about any other ballistics tests performed in New York or San Francisco, and (c) stated that J/R2, J/R4 and B3 were too deformed for expert comparison purposes.

First, Simmons did not take to San Francisco all of the .45 caliber evidence which had been retrieved from the crime, as he testified at trial:

> Q. And while you were in California, did you take all this ballistics evidence that you just referred to in your testimony?
>
> A. Yes.

(Tr. 5755). As indicated above, the present evidence clearly establishes that two of the six bullets (J/R2 and J/R4) and one of the six cartridge shells (B3) retrieved from the crime were actually in the possession of the FBI at the time that Simmons went to San Francisco, a fact Simmons must have been aware of since he was the person who signed out the three pieces of evidence to the FBI on August 10, 1971 and signed them back in on March 14, 1972.

Second, the September 24, 1971 tests were not the first (or only) ballistics tests conducted on the .45 caliber ballistics material. It is true that the defendants did not ask Simmons whether he knew of *any* other tests that had been conducted, but only whether he knew of any other tests that had been conducted in New York or San Francisco. However, even excluding the FBI tests which were conducted in Washington, D.C. and thus not directly implicated by those questions, Simmons failed to mention the September 7 and 8, 1971 tests, which he himself had conducted in New York City, and thus to that extent testified falsely.

Third, the three pieces of evidence for which Simmons did not make a positive identification—J/R2, J/R4 and B3—were not "too deformed" to test as Simmons stated at trial. As discussed at length above, the evidence establishes that J/R2, J/R4 and B3 were testable. In addition, at the evidentiary hearing he admitted that he never tested, or even attempted to test, J/R2, J/R4 and B3:

> The Court: Am I right also that you never made an attempt to match J 2, J 4 and B 3 or is it that you did make an attempt and failed?
>
> Simmons: I didn't make an attempt, your Honor. It wasn't—the FBI had it when I was doing the work.
>
> . . . .
>
> The Court: When you got them back why didn't you?
>
> Simmons: Because I put them in the file and I didn't think there was any cause for it.

(H. 331).

The People assert that Simmons may have simply forgotten at the time he testified at trial on February 27, 1975 about such "details" as whether he had taken all of the bullets with him to San Francisco or whether J/R2, J/R4 and B3 were too deformed to test. However, the first time Simmons told the story he told at trial was not in 1975 during the second trial, or even in 1974 during the first trial, it was in his sworn testimony before the Grand Jury on November 18, 1971—less than two months after he had travelled to San Francisco, and while J/R2, J/R4 and B3 were still with the FBI.

Detective Simmons testified before the Grand Jury that he took all five of the .45 caliber bullets retrieved from autopsies (including J/R2 and J/R4) to San Francisco.[4] He also testified that the reason he had been unable to match J/R2 and J/R4 positively with the gun was because they were too

---

4. Q. Now, later during the year of 1971 did there come a time when you went someplace with *all of these bullets* [i.e., the five .45 caliber bullets retrieved from autopsies, which included J/R2 and J/R4] that you have told us about?

A. Yes.
Q. And where did you go?
A. San Francisco, California.
(GJ. 67–68) (emphasis added).

deformed to test.[5] Accordingly, it is very difficult to conclude that the false statements were due to mere carelessness, and the greater likelihood is that Simmons' answers were deliberate and knowing.

*Does the perjury require a new trial?*

■ Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury.

*United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991). Here, the evidence does not establish that the prosecutors had knowledge that Simmons' testimony was false. Even assuming the prosecutors had read the September 13, 1971 ballistics report, they had no reason to know from that report or any other document shown to have been in their possession that Simmons was committing perjury as to the three points about which he testified falsely at trial: (1) that he took all of the ballistics evidence with him to San Francisco, (2) that J/R2, J/R4, and B3 were too deformed to test, and (3) that no prior comparison of Bottom and Washington's gun to the ballistics evidence in the case was conducted in either New York or San Francisco.

In such circumstances, the rule is

> Where the government was unaware of a witness' perjury, however, a new trial is warranted only if the testimony was material and "the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Sanders [v. Sullivan]*, 863 F.2d [218] at 226 [2nd ·Cir.1988]; *see also United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir.1975) (The test " 'is whether there was a significant chance that this added item, developed by skilled counsel . . . could have induced a reasonable doubt in the minds of enough of the jurors to avoid a conviction.' ") (citations omitted).

*Id.* Petitioners have failed to meet this burden.[6]

Petitioners claim that disclosure of Simmons' perjury and of the FBI ballistics report would have enabled the defense to

— undermine Simmons' credibility,

---

**5.** Q. Why couldn't you do anything with the other two? [referring to J/R2 and J/R4]
A. The identification marks, as I explained earlier that I was looking for, were not on the bullets.
Q. And is there any reason why they were not on the bullets?
A. Yes, they were deformed by hitting some hard object.
(GJ. Transcript 66).
Q. And as to the two .45 caliber bullets *which were not deformed*, which were recovered from Patrolman Jones' body, you came to the same conclusion [i.e., that they came from petitioners' gun], is that correct?
A. That is correct.
(GJ. Transcript 71–72) (emphasis added).

**6.** Although the matter has not been decided authoritatively in this Circuit, there is a growing body of law holding that even if the prosecutors themselves do not know of perjury, they are chargeable with knowledge if a member of the investigating team knows of it. *United States v. Sanchez*, 813 F.Supp. 241, 247 (S.D.N.Y.1993) (Martin, J.). On this theory, it could be argued that a new trial is required because Simmons was a member of the prosecution team, even though the prosecutors themselves did not have such knowledge. On remand, Judge Martin held that "intentional perjury by law enforcement officers closely associated with the prosecution constitutes the 'knowing use of perjured testimony by the prosecution' so that the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *United States v. Sanchez*, 813 F.Supp. 241, 245 (S.D.N.Y.1993) (on remand from the Second Circuit decision noted below).

It is unclear what the Second Circuit's position is on this issue. Although the Court of Appeals has never addressed the matter directly, its analysis in such cases as *United States v. Sanchez*, 969 F.2d 1409, 1414–15 (2d Cir.1992), which involve the use of perjured testimony by law enforcement officials, suggests that it may not recognize this principle.

The *Sanchez* holding is not being applied in this case, not only because it is not clear whether it is the law of the Circuit, but more compellingly because, in *Sanchez*, the trial judge was dealing with testimony which took place in his presence, whereas here our conclusions as to perjury are based on circumstantial evidence derived from a transcript rather than the personal assessment of testimony; and, in *Sanchez* the trial the court was reviewing was quite recent, whereas the present case relates to a trial which occurred 18 years ago. It is highly doubtful that in 1975 it could have been successfully argued that the law entitled a defendant to a new trial because a "prosecution team member" testified perjuriously even though the prosecutor had no knowledge of the perjury.

— cast doubt on the People's claim that the .45 caliber handgun from San Francisco was a murder weapon, and

— call into question the other factual elements of the prosecution's case.

They further contend that disclosure of Simmons' perjury would have given credence to the defendants' claim that the prosecution was a "frame up"—the prosecution contended at trial that the "frame-up" described by the defendants was ludicrous and that the defense's argument was "drenched with paranoia." (T. 9293).

Petitioners were members of a group called the Black Panther Party. As revealed in the documentary evidence presented by petitioners, almost from the outset of the investigation, Black militants were suspected as being the perpetrators of the Jones/Piagentini murders and the FBI was deeply involved in the investigation. For example a May 27, 1971 internal FBI memorandum states:

I told the Director that we had offered the above-named services immediately after the murders became known on May 21, 1971, that we had been in daily contact with the PD [i.e., the NYPD] and that we had assured the PD of our desire to do everything possible to assist in the solution of these murders. I told the Director we had alerted our informants knowledgeable in the area involved and those aware of black extremist activities and that any information received would be relayed to the PD and also that we had identified for the PD certain suspects pickup up for firearms violations or for questioning as suspects in these murders and we had identified certain of these suspects as members of the Black Panther Party (BPP). I mentioned the two Black Panthers picked up by the PD at the "Daily News" office whom we identified to the PD as BPP members for California responsible for distribution of the "BPP Newspaper".

(Pet. Hearing Exh. 204). At the time of the Jones/Piagentini murders, conflicts between Black militant organizations and the government were at a peak. The defendants argued at trial that the government would have gone to any lengths to convict Black Panthers of the murders.

Petitioners argue that, if they had had evidence of Simmons' perjury at trial, the defense could have persuasively argued that the People would go to any lengths to convict the defendants and could have raised serious doubts in the minds of the jurors as to the guilt of the petitioners. However, as discussed above, the petitioners have failed to prove that the prosecution was complicit in Simmons' perjury, and it is extremely unlikely that disclosure of Simmons' perjury, by itself, would have shaken the jury's faith in the "other factual elements of the prosecution's case."

As to whether the disclosure of Simmons' perjury might have "cast doubt on the People's claim that the .45 caliber handgun from San Francisco was a murder weapon," this argument is not persuasive because the only thing Simmons could be proven to have done is hide the FBI ballistics results and nothing in the FBI report undercuts Simmons' testimony as to the nine pieces of ballistics evidence which *were* in the NYPD's possession in September 1971.

Finally, even assuming the disclosure of Simmons perjury would have destroyed the prosecution's identification of the .45 caliber gun as a murder weapon, even without the gun identification, the prosecution's case was extremely strong. It rested on the following compelling evidence:

— the testimony of Karen Parks, Jacqueline Tabb, and Linda Torres regarding the defendants' plans to kill police officers and their "boasts" of having done so

— proof of Bell's fingerprint on a car at the crime scene, that, according to the eyewitnesses, the killers were leaning on prior to the shooting

— eyewitness identification of Bottom by two witnesses

— Rubin Scott's testimony about (a) discussions defendants had had about "scoping pigs,": (b) the request to mail a .45 caliber and a .38 caliber gun to defendants in New York, and (c) Bell's burial of a gun, which turned out to be Officer Piagentini's service revolver, on

Bell's grandfather's farm in Mississippi, and

—  possession by Bottom and Washington of the service revolver of Waverly Jones, one of the slain police officers, at the time of their arrest

Accordingly, upon review of the entire record, I cannot conclude that "but for the perjured testimony, the defendant would most likely not have been convicted." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991).

For the reasons stated above, the petition is denied.

It is so ordered.