Anthony BROWN, Petitioner,

v.

Michael McGINNIS, Superintendent, Southport Correctional Facility; and Dennis Vacco, New York State Attorney General, Respondents.

No. 98–CV–4456 (JG).

United States District Court, E.D. New York.

July 9, 1999.

**856**

Karen M. Kalikow, The Legal Aid Society, Criminal Appeals Bureau, New York City, for Petitioner.

Charles J. Hynes, District Attorney, Kings County, Brooklyn, NY, by Anthea H. Bruffee, Assistant District Attorneys, for Respondents.

### MEMORANDUM AND ORDER

GLEESON, District Judge.

Following a 1986 trial in New York State Supreme Court, Kings County, petitioner Anthony Brown ("petitioner" or "Brown") was convicted of three counts of

murder in the second degree, six counts of criminal possession of a weapon, and one count each of attempted murder in the second degree, assault in the first degree, and robbery in the first degree. Brown's convictions resulted from his involvement in a series of violent crimes he allegedly committed under the street name "Tony Tuff." Specifically, Tony Tuff was identified as the individual, or one of the individuals, who robbed and shot Junior Nugent on May 18, 1995; attempted to murder Conrad Tullonge on or about July 3, 1985; and carried out the execution-style killings of Lance Tullonge, Rohan Tullonge and Paul Tullonge on or about July 3, 1985. (Lance and Rohan Tullonge were the brothers of Conrad Tullonge, and Paul Tullonge was Conrad Tullonge's cousin.) During petitioner's trial, both Junior Nugent and Conrad Tullonge testified that petitioner was the person who had shot them, and was the man they had known as Tony Tuff. (Tr. 112, 549–50).[1]

As described in more detail below, for reasons unrelated to the present petition, the Appellate Division vacated Brown's three murder convictions, four the six weapons convictions, and the convictions for robbery and assault.[2] Pursuant to 28 U.S.C. § 2254, Brown now petitions this Court for a writ of habeas corpus with respect to the remaining convictions, i.e., one count of attempted murder in the second degree and two counts of criminal possession of a weapon in the second degree.

Brown sets forth three grounds in support of his petition. First, he contends that the prosecutor violated his continuing obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not disclosing favorable testimony that Conrad Tullonge gave in the sub-

---

1. The abbreviation "Tr." refers to the trial transcript of *People v. Anthony Brown*, Indictment Number 4633/85.

2. Following a second state-court trial, Brown was once again convicted of three counts of

murder in the second degree and one count of robbery in the first degree, and was sentenced to a minimum of eighty years in prison. (Letter to the Court from Anthea H. Bruffee, Esq., dated Mar. 18, 1999.)

sequent trial of Brown's alleged co-conspirator. Second, Brown argues that he was denied due process when, after realizing at the trial of Brown's alleged co-conspirator that Conrad Tullonge had given false testimony during petitioner's trial, the prosecutor failed to inform petitioner that the prior testimony was false. Finally, Brown contends that his conviction is so heavily predicated on false testimony that it violates due process and must be set aside.

For the reasons discussed below, the petition is denied.

## BACKGROUND

### A. The Crimes Attributed to "Tony Tuff"

#### 1. The Robbery and Shooting of Junior Nugent

On May 18, 1985, Junior Nugent and Michael McLean were walking near the corner of Lott and Tilden Avenues in Brooklyn, New York. (Tr. 45–46, 110.) At approximately 3:00 p.m., an individual whom Nugent and McLean knew as Tony Tuff exited a car and approached them. (Tr. 46, 111.) Tuff first addressed McLean while Nugent stood approximately ten feet away counting money. (Tr. 48.) Tuff accused McLean of stealing marijuana from him, and demanded that McLean either return the stolen marijuana or pay him for the drugs. (Tr. 48–49.) McLean denied any knowledge of the stolen marijuana, and told Tuff to ask whether Nugent knew anything about it. (*Id.*)

Tuff then called Nugent over, accused Nugent of stealing the marijuana from him, and demanded that Nugent either hand over the money or the drugs. (Tr. 49, 113.) When Nugent denied that he had stolen any drugs, Tuff pointed a handgun at Nugent's chest and again demanded the money. (Tr. 112–13.) Nugent removed approximately $150 from his pocket and handed it to Tuff. (Tr. 113.) Tuff then took one or two steps away and fired a single shot into Nugent's left leg. (Tr. 50, 113–14.) Tuff fled the scene while Nugent attempted to run across the street, fell, and was taken to Kings County Hospital by McLean. (Tr. 50–51, 114.) At the Kings County Hospital emergency room, Dr. Robert Borrego, the admitting resident, observed that a bullet had passed entirely through Nugent's left thigh and lodged in his right thigh. (Tr. 238.) Nugent underwent an angiogram to repair veins and arteries damaged by the bullet, was discharged after four or five days, and subsequently returned to the hospital to have the bullet removed. (Tr. 238–239.)

#### 2. The Attempted Murder of Conrad Tullonge

On July 3, 1985, at approximately 6:10 a.m., Emmons Trim was walking his dog in front of his house at East 35th Street in Brooklyn when he noticed a man staggering down the road. (Tr. 164.) As the man approached, Trim observed that the man was bleeding from the face and head. (Tr. 165.) While Trim went back inside his house to call an ambulance, the bleeding man sat down in the flower garden in front of Trim's house. (Tr. 166.) When Trim came back outside after calling the ambulance, the bleeding man had left the flower garden. Trim saw that the man was now slumped over a car east of Farragut Road and East 35th Street, and police officers were at the scene. (Tr. 167.)

At approximately 6:15 a.m. on the same morning, New York City Police Officers Scott Curcio and Frank Sarno received a call over their police radio, instructing them to respond to an individual who was bleeding in the street near Brooklyn Avenue and Farragut Road. (Tr. 269–270.) Upon arriving at the scene, Officers Curcio and Sarno found a man slumped over the hood of a car. (Tr. 273.) The man's head was covered with blood but he was conscious, and he identified himself as Conrad Tullonge ("Conrad"). (Tr. 275.) When Officer Curcio asked Conrad what had happened, Conrad answered that he had been shot. (Tr. 276.) Officer Curcio, who

did not immediately see any bullet holes in Conrad's body, proceeded to lift Conrad off the car by the back of the neck. (*Id.*) As he did so, Curcio heard a "ping" and noticed a bullet rolling down the hood. (*Id.*) At some point while providing assistance, Officer Curcio asked Conrad if he knew who shot him, and Conrad responded "Tuff, Tuff." [3] (Tr. 299.) Officer Curcio then called an ambulance to the scene, and Officer Sarno accompanied Conrad to Kings County Hospital. (Tr. 277, 289.)

On July 3, 1985, the admitting resident—who again happened to be Dr. Robert Borrego—treated Conrad upon his arrival. (Tr. 243–44.) Dr. Borrego determined that Conrad had suffered three gunshot wounds: one in his face to the right of the nose, one just behind the ear, and another in the left forearm. (Tr. 244–45.) Neurosurgeons subsequently operated on Conrad to relieve a blood clot in his head, and to remove damaged tissue, bone and bullet fragments from his brain. (Tr. 245–46.) Conrad also underwent surgery to repair broken bones in his arm. (Tr. 246.) Conrad survived the surgery and the shooting, but as a result of the injury to the head and the removal of damaged tissue, suffered a form of brain damage. (Tr. 247–48.) According to Dr. Borrego, during the time Conrad was in the hospital this brain damage manifested itself as expressive aphasia, a condition in which a person is able to understand but cannot verbally express his thoughts. (Tr. 248.) Dr. Borrego also stated that the damage to Conrad's brain apparently caused him to suffer from retrograde amnesia. (*Id.*)

3. *The Murders of Lance Tullonge, Rohan Tullonge, and Paul Tullonge*

At approximately 9:50 a.m. on July 3, 1985, Officers William Ellis and George Mastorides received a radio call directing them to proceed to 3208 Snyder Avenue in Brooklyn. (Tr. 314.) Upon arriving at that location, the officers entered an apartment and noticed that the first room they entered, the living room, was "a little messed up." (Tr. 317.) The officers also noticed that a pool of blood had gathered near a back bedroom door. (Tr. 317–18.)

When Officer Ellis opened the back bedroom door, he discovered the bodies of three deceased males. (Tr. 318–19.) The body of one—later identified as Rohan Tullonge (Tr. 338)—was lying face down on a bed. He had been bound at the ankles and hands, and a cloth was tied around his mouth. (Tr. 319–21, 338–39.) Partially dried blood was coming from his head and had run off the bed and out the bedroom door. (Tr. 320–21, 339–40.) Upon conducting an autopsy, medical examiner Lila Perez found that Rohan Tullonge had been shot twice in the head. (Tr. 630–33.)

The body of a second male—Lance Tullonge—was lying face down on the floor near a dresser. (Tr. 322, 336.) Lance Tullonge's hands were not bound, but there was blood on his neck, head and back. (Tr. 322, 337.) The medical examiner subsequently determined that Lance Tullonge had been shot six times,[4] including three shots to the head, one to the right side of the abdomen, one to the arm and one that grazed the hand. (Tr. 605–09.)

The third victim at 3208 Snyder Avenue, found lying face up near a bed on the left side of the room, was Paul Tullonge. (Tr. 319, 333, 389–91.) There was blood around Paul Tullonge's face and head, and his hands were tied behind his back. (Tr. 321, 334–36.) He had been shot once in the forehead and once in the neck. (Tr. 622–25.)

---

3. At the time, Officer Curcio interpreted this to mean that Conrad was unwilling to identify the person who had shot him. (Tr. 299.)

4. Although the medical examiner's report stated that there were seven gunshot wounds to Lance Tullonge's body, one shot entered and exited the right forearm, thus giving rise to two wounds. (Tr. 605, 608, 612–13.)

## B. *The Trial of Anthony Brown*

Between November 12, 1986 and December 2, 1986, Anthony Brown stood trial for his involvement in the above-described crimes, and was represented by Kenneth Bruce, Esq. During the course of the trial, one of the key witnesses for the prosecution was Conrad Tullonge. Because Brown grounds his petition for habeas relief on the falsity of certain of Conrad's testimony, it is necessary to consider that testimony in detail.

### 1. *Conrad's Direct Examination*

The bulk of Conrad's testimony on direct examination related to the events of July 3, 1985, the day Conrad was abducted and shot by petitioner (known to Conrad as Tony Tuff) and others. In the summer of 1985, Conrad shared a residence at 3208 Snyder Avenue with his brothers Lance and Rohan Tullonge, and their cousin Paul Tullonge. (Tr. 550–51.) At approximately 6:30 p.m. on July 2, 1985, Lance Tullonge returned home from work and told Conrad that Tony Tuff wanted to speak with him. (Tr. 554.) Conrad testified that he then went to the home of a female friend named Dawn, stayed there for some time, and departed. (Tr. 555.)

Conrad testified that he next remembered somehow finding himself at the home of Tony Tuff.[5] (*Id.*) An individual referred to as "Richie" pointed a gun at Conrad, and another person named "Coconut" was positioned nearby, while Tuff demanded that Conrad tell him where Tuff's "thing" was. (Tr. 556–57.) After Conrad told them that he didn't know what Tuff was talking about, Tuff told Coconut to get some rope so that Tuff could tie up Conrad. (Tr. 558.) At some point, another individual referred to as "Big T" or "Volvo" entered the room, and Tuff told Volvo to tie up Conrad and take him somewhere. (Tr. 558–59.) Tuff eventually tied Conrad's hands behind his back while Coconut tied Conrad's ankles together. (Tr. 561–62.) Tuff and Coconut then forced Conrad to lie down on a couch. (Tr. 563.)

With Conrad bound and lying on a couch, Tuff again demanded that Conrad tell him where the "thing" was. (*Id.*) Conrad repeated that he didn't know what Tuff was talking about, and told Tuff that if he didn't believe him, he could take Conrad's keys, go to Conrad's house and talk to Paul Tullonge about whatever "thing" Tuff was looking for. (Tr. 564–65.) Tuff took Conrad's keys out of his pocket and said that he would go to Conrad's house to find out whether Conrad was lying. (Tr. 565.) Tuff left with Richie and Volvo, while Coconut stayed behind with Conrad. (*Id.*) Conrad then fell asleep. (Tr. 565–66.)

At some point thereafter, according to Conrad's testimony, Tuff and the others returned to the house and stood around Conrad. (Tr. 566–67.) Tuff said that he didn't get his thing, and that he was going to "hold" Conrad for it. (Tr. 567.) As Tuff and Volvo pointed guns at Conrad, the four men surrounded him, took him outside of the residence and put him into a car. (Tr. 568, 570.) Tuff and Volvo drove with Conrad for some time, pulled him out of the car and walked him down a ramp. (Tr. 571–74.) Tuff told Conrad to kneel and, as Conrad did so, Tuff pushed Conrad fully to the ground. (Tr. 575–76.) According to Conrad, Tuff then pointed his gun at Volvo and threatened to shoot Volvo if Volvo didn't shoot Conrad. (Tr. 576.)

---

**5.** Conrad did not have any recollection as to how he ended up in Tuff's home. (Tr. 555.) However, a witness named Michael Lewis testified that at approximately 5:30 a.m. on the morning of July 3, 1985, he was walking near Conrad's house when he saw Conrad coming down the street with his keys in his hands, apparently on his way home. (Tr. 181–82, 184–85.) Lewis then saw four men exit a gray Chrysler with Florida license plates and approach Conrad near the gate to his house. (Tr. 187–88.) Two of the men—including petitioner Anthony Brown—stuck guns in Conrad's side and forced him into the back seat of the car, at which point all four men reentered the car and drove away. (Tr. 190, 192–95.)

Conrad turned, looked into a pistol, and then blacked out. (*Id.*) Apart from some confused memories of getting up, walking blindly through the streets and having medical personnel place a mask over his face, Conrad testified that his next memory was of waking up in the hospital. (Tr. 577–80.) Finally, Conrad testified that Anthony Brown was the man he had known as Tony Tuff. (Tr. 580.)

### 2. Conrad's Cross Examination

During cross examination, Brown's defense attorney attempted to establish that Conrad was a drug dealer or was otherwise involved with narcotics. Conrad consistently denied that he had engaged in drug dealings and drug use. At one point, defense counsel elicited the following testimony regarding Conrad's dealings with the men who had abducted and shot him:

Q: Did you ever have any dope dealings with Tuff?

A: Not as I remember.

Q: Did you ever have dope dealings with Richie?

A: Not as I remember, sir.

Q: Did you ever have any dope dealings with Coconut?

A: Not as I remember, sir.

Q: Did you ever have any dope dealings with Big T?

A: Never saw him before I got shot.

(Tr. 780–81.) Shortly after the above exchange, Brown's attorney asked Conrad several further questions about his involvement in drug dealing, including drug dealings with Tony Tuff:

Q: Did you ever see narcotics in your apartment?

A: No.

Q: Did you deal narcotics?

A: No.

Q: Isn't a fact that you had to go Florida on a narcotics deal?

A: No.

\*\*\*

Q: Never dealt drugs with this fellow called Tuff?

A: Not if I remember, sir.

(Tr. 782–83.) Finally, defense counsel inquired as to Conrad's own narcotics use:

Q: Now, Mr. Tullonge, are you addicted to any drugs?

A: No.

Q: Do you smoke marijuana?

A: No.

Q: Did you take cocaine?

A: No.

Q: You sure about that?

A: I'm one hundred percent sure.

Q: And you can't remember whether there was [sic] any narcotics in your apartment on July 3rd, 1985?

A: No, sir, because there's a lot of things I don't remember. The only reason I will never—maybe will never, I said again, never remember, 'cause that part of the brain was damaged.'

(Tr. 786.)

### 3. The Verdict and Sentence

As stated, the jury convicted Brown of three counts of the Murder in the Second Degree (for the murders of Lance, Paul and Rohan Tullonge), one count of Attempted Murder in the Second Degree (for the attempted murder of Conrad), one count of Robbery in the First Degree and two counts of Assault in the First Degree (for the robbery and shooting of Junior Nugent), and Six Counts of Criminal Possession of a Weapon in the Second Degree (for the possession of three weapons during the killings of Lance, Paul and Rohan; two weapons during the shooting of Conrad; and one weapon during the robbery and shooting of Nugent). On January 15, 1987, the trial court sentenced Brown to an aggregate prison term of eighty-eight and one-third years to life.

### C. The Trial of Patrick Williams

In October 1987, less than one year after petitioner's trial, Patrick Williams stood trial for his alleged involvement in the murders of Lance, Rohan and Paul Tullonge, and the attempted murder of Conrad Tullonge. Conrad again testified in this trial, and identified Patrick Williams as the individual named "Richie" who had participated in the abduction and shooting of July 3, 1985.[6] (Williams Tr. 13.)

#### 1. Conrad's Direct Testimony

On direct examination, Conrad provided a somewhat more detailed version of the events leading up to his abduction than he had given during Brown's trial. In Brown's trial, Conrad had testified that after his brother Lance told him that Tony Tuff wanted to see him, Conrad instead went to the home of a woman named Dawn and only ended up at Tuff's home sometime later. (Williams Tr. 554–55.) By contrast, in Williams' trial, Conrad testified that he first voluntarily visited Tuff's home, then left to visit Dawn, and only later found himself back with Tuff and the others who threatened and shot him. (Williams Tr. 9–16.) According to Conrad, in his first visit to Tuff's home, Richie and Coconut were the only individuals present. (Williams Tr. 11.) Conrad testified that he had never met Richie before, and that he and Richie engaged in a conversation about whether Tuff or Richie actually owned the home. (Williams Tr. 13–14.) After that conversation, according to Conrad's testimony, he left the home he had thought was Tuff's, returned to his own home to sleep for a short time, and then went to visit Dawn. (Williams Tr. 13–14.) Conrad then testified as to being tied up,

threatened and shot on the morning of July 3, 1985.[7]

During the course of his direct examination, Conrad was also asked about his involvement with drugs, as well as the involvement of his brothers and cousin. Conrad testified that, prior to the arrival of Paul Tullonge in approximately May 1985, there were never any narcotics in Conrad's apartment at 3208 Snyder Avenue, and Conrad had never had any dealings with marijuana or cocaine. (Williams Tr. 70–71.) Conrad then proceeded to contradict the testimony he had previously given at petitioner's trial. Specifically, Conrad testified that there was marijuana and cocaine in the apartment after Paul Tullonge began staying there, and that Conrad twice went to Miami to pick up cocaine for Paul Tullonge to sell. (Williams Tr. 71–73.) Conrad stated that his only function was to purchase the cocaine for Paul Tullonge to re-sell. (Williams Tr. 72.) When asked whether he ever assisted Paul in selling the cocaine, Conrad replied: "Not really. Most of the time it was mostly Paul that dealt with that part of this." (Williams Tr. 73.) Conrad also testified that Rohan acted as the accountant for Paul's drug trafficking, and that Lance was not involved in drug transactions at all.[8] (Williams Tr. 74.)

#### 2. Conrad's Cross–Examination

#### a. The Tullonges' Drug Operations

On cross examination, counsel for Patrick Williams probed deeply into the Tullonges' involvement with narcotics and Conrad's prior inconsistent testimony on that issue. Conrad testified that he, Paul and Rohan Tullonge began possessing and selling marijuana and cocaine in approxi-

---

**6.** "Williams Tr." refers to the trial transcript of *People v. Patrick Williams,* Indictment Number 2784/86.

**7.** Although Conrad's testimony regarding his abduction and shooting differed somewhat from the testimony he had given at Brown's trial, the differences are neither material nor the subject of the present petition.

**8.** Conrad further stated that while he had never carried a weapon and had never seen Rohan or Lance do so, Paul Tullonge kept at least two guns inside the apartment and carried them whenever he left the apartment. (Tr. 74.)

mately March 1985, shortly after Paul came from Jamaica to the United States. (Williams Tr. 135–36.) Conrad also testified that, although Lance Tullonge was never involved in the narcotics operation, he lived in the same apartment as Paul and Rohan during the time period in question and did not interfere with the drug dealings of the others. (Williams Tr. 137–38.)

Defense counsel next attempted to establish the extent of the Tullonges drug-dealing activities. In response to questions regarding how much money the Tullonges had made between March and July 1985, Conrad initially stated that they had made only $1,000 dollars, but then subsequently corrected himself and estimated that the drug operations had brought in approximately $20,000. (Williams Tr. 144–45.) Defense counsel then asked Conrad about the presence of drugs, money and guns in the Tullonges apartment on July 3, 1985, the day of the shootings. (Williams Tr. 146.) Conrad stated that cocaine, money, and approximately two to three guns—including a handgun and what Conrad believed was a machine gun—were present in the apartment that day. (Williams Tr. 146–154.)

The cross-examination next turned to the subject of Conrad's drug trips to Florida, which Conrad had briefly described during his direct examination. Conrad testified that he had made two drug-related trips to Florida. (Williams Tr. 154.) The first was made with a friend named Bobby Reds. (Tr. 154.) According to Conrad, he and Bobby Reds traveled together to Florida, paid $5,000 for eight ounces of cocaine, and returned to New York with the drugs. (Williams Tr. 155–57.) The Tullonges then sold this cocaine out of their apartment at 3208 Snyder Avenue in Brooklyn. (Williams Tr. 157–58.) In late June 1985, according to Conrad, he made a second trip to Florida for the purpose of buying drugs, this time traveling alone. (Williams Tr. 158–59.) Defense counsel asked Conrad if he had ever made another

trip to Florida with Paul Tullonge and one or two others, and if, on that trip, he and the others had ripped off $50,000 worth of cocaine from drug dealers. (Williams Tr. 158–59.) Conrad denied making any such trip, and denied stealing any drugs from a Florida drug dealer. (Williams Tr. 159–60.) Defense counsel also asked Conrad if he and Paul Tullonge had ever ripped off a Brooklyn drug dealer named "Monte" shortly before July 2, 1985. (Williams Tr. 161.) Conrad denied that allegation as well, and further testified that he had never robbed anyone of money and had never seen Paul Tullonge do so either. (Williams Tr. 162–63.)

Defense counsel impeached Conrad based on his prior testimony denying the Tullonges' drug dealing activity. Conrad conceded that he had never told anyone about his or the Tullonges' involvement with drugs until October 25, 1997—just two days earlier—when he had mentioned it to Assistant District Attorney ("ADA") Paul Rufolo. (Tr. 164–65.) Conrad further admitted that Rufolo had asked him, prior to petitioner's trial, whether he was involved in drug dealings, and that Conrad had told Rufolo he was not. (Williams Tr. 168–69.) When asked by Williams' defense counsel whether he had lied to Rufolo prior to petitioner's trial, Conrad testified that he had not lied. Instead, according to Conrad, at the time of Rufolo's prior inquiry he was "still very sick" due to the gunshot wound to his head, and "wasn't sure of myself saying did I [sell drugs] or not." (Williams Tr. 169.)

Defense counsel then read from that portion of the testimony given at petitioner's trial in which Conrad denied ever seeing drugs in the Tullonges' apartment, denied dealing in narcotics, and denied having ever gone to Florida on drug-related trips. (Williams Tr. 171; see also Tr. 782–83.) Conrad again denied that this testimony was false, instead insisting that he believed it to be true at the time of petitioner's trial, that he had been suffer-

ing from a brain injury and resultant memory loss when he testified against Brown, and that only subsequently, through therapy, did his regain his memories of prior drug dealing activities. (Williams Tr. 172–79.)

#### b. Conrad's Initial Visit to Tony Tuff's Apartment

During cross-examination, Williams's counsel also followed up on Conrad's assertion that on July 2, 1985, before being abducted, he had voluntarily visited Tony Tuff's apartment. Conrad testified on cross that his brother Lance came home at approximately 5:30 p.m. on July 2 and told Conrad that Tony Tuff wanted to speak with him. (Williams Tr. 184.) According to Conrad, Lance told him that Tony Tuff wanted to know whether Conrad was familiar with a Jamaican individual whom Tuff also knew. (Williams Tr. 184–85.) Conrad testified that he left the Tullonges' apartment at approximately 8:30 p.m. and walked for fifteen or twenty minutes until he arrived at Tuff's apartment at 2041 Newkirk Avenue. (Williams Tr. 194.) Upon arriving at Tuff's apartment, Conrad spoke with Richie and another individual, who told Conrad that Tuff was not there. (Williams Tr. 196.) Conrad testified that no one asked him about the location of the "stuff" or the "thing," and that although the individuals in the apartment asked him to stay and wait for Tuff to return, Conrad told them he had something to do, and he was permitted to leave the apartment without anyone attempting to stop him. (Williams Tr. 196–201.) When Williams' counsel asked if it was true that Conrad had never previously mentioned this voluntary visit to Tuff's apartment, Conrad stated that he thought he had told Detective·

Krause at the time he identified Richie in a lineup. (Williams Tr. 186–191.) [9]

#### D. Petitioner's CPL § 440.10 Motion

##### 1. Petitioner's Discovery of the Substance of Conrad Tullonge's Testimony at the Williams Trial

Petitioner asserts that, at some unidentified point after Patrick Williams' trial, he learned through an unidentified source that the testimony Conrad gave at the Williams trial conflicted with the testimony Conrad had given at petitioner's trial. (Petitioner's Memorandum of Law and Appendix in Support of Petitioner for a Writ of Habeas Corpus ("Pet.Mem.") at 19.) Brown alleges that in October 1988 he first informed his first appellate counsel about what he had heard regarding Conrad's testimony, but his appellate counsel was unable to examine the transcript of the Williams trial because it was then under seal.[10] (Id. at 19–20.) On April 21, 1989, Justice Philip E. Lagana, who had presided over both petitioner's trial and the Williams trial, unsealed the record of the Williams trial so that petitioner's appellate counsel could examine it. (Id.) Petitioner asserts that in January 1990, his second appellate counsel finally received all the minutes of the Williams trial and began to prepare a motion to vacate petitioner's judgment of conviction under New York Criminal Procedure Law ("CPL") § 440.10.[11]

##### 2. The Basis of Petitioner's CPL § 440.10 Motion

On May 25, 1990, Brown filed a CPL § 440.10 motion with Justice Lagana and argued, inter alia, that the conviction should be set aside because the prosecutor knowingly failed to correct the perjured

---

9. The jury subsequently acquitted Patrick Williams of all charges against him. (Affidavit of Anthea H. Bruffee, dated Oct. 30, 1998, at ¶ 10.)

10. The record does not indicate the identity of petitioner's first appellate counsel.

11. Petitioner's second appellate counsel was Steven C. Losch, Esq., of the law offices of Philip L. Weinstein.

testimony of Conrad Tullonge. (*See* Affidavit of Anthea H. Bruffee ("Bruffee Aff.") Ex. A.) In an affidavit submitted in support of the motion, Brown's counsel asserted that Conrad had perjured himself when he falsely denied any involvement in drug dealings and "feigned a loss of memory" about his first visit to Tony Tuff's apartment on the night he was shot. (Bruffee Aff. Ex. A at ¶ 2.) With regard to the conduct of ADA Mark Rufolo, who had been the prosecutor at petitioner's trial, petitioner's counsel argued as follows:

> Rufolo has known for at least three years that Mr. Brown's conviction was tainted by [Conrad] Tullonge's lies and he has done nothing to correct the fraud. If Rufolo did not know during the trial that Conrad gave false testimony, he displayed a suspicious disinclination to discover the truth about his star witness. In any event, Rufolo's duty to take some remedial action did not end when Mr. Brown was sentenced.

(Bruffee Ex. A at ¶ 6.)

In an affirmation submitted in response to Brown's CPL § 440.10 motion, ADA Rufolo stated that, in his view, Conrad had not committed perjury. Rufolo asserted that Conrad was still mentally impaired at the time of Brown's trial due to the gunshot wound to his head, and that Conrad testified to the best of his ability at the time. (Bruffee Aff. Ex. B ¶ 8.) Rufolo further stated that, at the time of petitioner's trial, he did not know that Conrad had participated in a drug transaction with Paul Tullonge, and that he only learned of this transaction during the *Williams* trial. (*Id.*)

In a memorandum dated December 6, 1990, Justice Lagana ordered that a hearing be held on Brown's CPL § 440.10 motion. After noting petitioner's claim that ADA Rufolo had either known of Conrad's perjurious testimony at the time it was given or had failed to notify defense coun-

sel when he learned of it, Justice Lagana quoted the Court of Appeals' decision in *People v. Savvides*, 1 N.Y.2d 554, 154 N.Y.S.2d 885, 136 N.E.2d 853 (1956), as follows:

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way *relevant to the case*, the district attorney has the responsibility and duty to correct *what he knows to be false* and elicit the truth.

(Bruffee Ex. C at ¶ 8 (quoting *Savvides*, 1 N.Y.2d at 557, 154 N.Y.S.2d 885, 136 N.E.2d 853 (emphasis added by Justice Lagana)).) Accordingly, Justice Lagana stated that, in addition to the other issues to be addressed at the hearing, Brown would bear the burden of showing that Conrad's testimony had been both perjurious and relevant to the case. (Bruffee Ex. C at ¶ 8.)

### 3. *The Hearings on Petitioner's CPL § 440.10 Motion*

Due to Justice Lagana's retirement, Brown's CPL § 440 hearing was held before Justice Herbert J. Lipp of New York Supreme Court, Kings County, on April 15, August 30–31, and October 5, 1993. (PetMem. at 21.) Petitioner called three witnesses during the course of the hearings. First, former ADA Bonnie Nathan testified that in July 1985, she had been assigned to prosecute petitioner for murder and robbery. (Section 440.10 Tr., 4/15/93, at 15.).[12] According to Nathan, she asked Conrad during her pre-trial preparation whether he had ever sold drugs, and Conrad denied that he had. (*Id.* at 41.) Nathan conceded that she had read DD–5 # 45—an investigative report that was prepared by New York City Police Detective Robert Krause suggesting that Conrad and certain of the Tullonges were involved in narcotics trafficking—and

---

**12.** "Section 440.10 Tr., 4/15/93" refers to the transcript of the April 15, 1993 hearing on

petitioner's motion pursuant to CPL § 440.10.

that she confronted Conrad with the information contained in the report. (*Id.*)[13] Nathan testified, however, that her conversations with Conrad were "very sparse," because "his speech was barely intelligible at the time." (*Id.* at 41–42.) Nathan also stated that she had met with a doctor regarding Conrad's medical condition, and the doctor informed her that Conrad was suffering from a form of amnesia. (*Id.* at 24–25.) With regard to her own views as to whether Conrad had been involved in drug trafficking prior to being shot, Nathan stated that she was aware that drugs had been found in the Tullonge apartment and that she believed "the entire shooting event involved drugs," but asserted that she had "no basis to believe that Conrad Tullonge specifically was a dealer." (*Id.* at 40, 42–44.) Finally, Nathan testified that at some point in 1996, prior to trial, she transferred the case to ADA Rufolo and provided him with her case file. (*Id.* at 16.)

In support of the motion to vacate his sentence, petitioner next called ADA Rufolo. Rufolo testified that he took over the prosecution of petitioner's case less than a year before it went to trial. (Section 440.10 Tr., 8/30/93, at 10.)[14] Rufolo stated that he had interviewed Conrad between five and seven times prior to trial. (*Id.* at 23.) Although Rufolo could not recall a specific conversation in which he asked Conrad whether he had been dealing drugs prior to the shooting, Rufolo testified that he would have explored the issue with Conrad, especially given the fact that narcotics were found in the apartment in which Paul, Rohan and Lance Tullonge were murdered. (*Id.* at 24.) To the best of Rufolo's recollection, Conrad told Rufolo prior to petitioner's trial that he had no knowledge of the drugs or why they were in the Tullonge apartment, and Conrad denied being a drug dealer. (*Id.* at 24, 47–48.) Rufolo further testified that he had read DD–5 # 45, in which Conrad was described as a drug dealer, but that by November 1986 Rufolo had not formed an opinion as to whether Conrad had been dealing drugs prior to being shot. (*Id.* at 26–28.) With regard to Conrad's neurological condition at the time of Brown's trial, Rufolo stated that he had been informed by a doctor that Conrad had suffered brain damage as a result of the bullet wound to his head; that Conrad had amnesia and problems communicating, although those conditions had improved since the shooting; and that as time went on, Conrad would be better able to communicate and to remember past events. (*Id.* at 16, 19.)

Petitioner's counsel then asked Rufolo whether Conrad had told him, between the time of petitioner's trial and the *Williams* trial, that Conrad had been a drug dealer.

**13.** In pertinent part, DD–5 # 45 states as follows:

> Conrad and Paul dealt in weight with the drugs over the phone, "coke". They made the deal & then the customer would come to pick it up.
>
> Recently, Conrad went to Florida to pick up Marijuana. Once they drove down and another time he flew down. He did not know if he went with anyone else. Conrad was the "mule" on the trips to Florida.
> ***
> The following is a list of the victims & their associates:
>
> *Rohan:* no connection, innocent victim.
> *Lance:* small dealer for extra money, showed off with guns to visitors.
> *Conrad:* Dealer.
> *Paul:* Dealer, had a machine gun.

(Pet.Mem. at 14 n. 3.)

In his memorandum of law, petitioner states that his "defense counsel apparently possessed" DD–5 # 45. (Pet.Mem. at 14 n. 3) In his ruling on petitioner's motion pursuant to CPL 440.10, Justice Lipp found that "defendant's possession of DD–5 # 45 is evidenced from his cross-examination at trial of Detective Krause." (Bruffee Aff. Ex. H at 14 n. 4.) Moreover, petitioner's counsel conceded during oral argument that the prosecutor had given DD–5 # 45 to petitioner's trial counsel. (Transcript of Oral Argument, Dec. 4, 1998, at 5–6.)

**14.** "Section 440.10 Tr., 8/30/93" refers to the transcript of the August 30–31, 1993 hearing on petitioner's motion pursuant to CPL § 440.10.

(*Id.* at 46.) Rufolo testified that he had asked Conrad during this period whether Conrad had been involved in the sale of narcotics and that Conrad mentioned a trip he had made to Florida. (*Id.*) However, Rufolo could not recall whether Conrad indicated that the trip was related to narcotics. (*Id.* at 46–47.) Rufolo further testified that he had no recollection of Conrad telling him prior to the *Williams* trial that he had in fact been a drug dealer at the time of the shootings. (*Id.* at 46.)

In response to questions posed by the People, ADA Rufolo testified that, prior to Brown's trial, he had no "definitive information" that Conrad was involved with narcotics, and that Conrad had denied any such involvement. (*Id.* at 65.) Rufolo stated that Conrad did not say anything to him about whether the killings were drug-related until the day immediately prior to the *Williams* trial. (*Id.* at 66.) Upon further questioning by petitioner's counsel, Rufolo described this conversation with Conrad in more detail. (*Id.* at 68.) Specifically, Rufolo testified that Conrad had told him just before the *Williams* trial that Lance and Paul Tullonge were involved with narcotics; that Conrad had gone on a trip to Florida that was related to narcotics; and that (to Rufolo's best recollection of what Conrad had told him) the trip involved either picking up or delivering drugs. (*Id.*) Rufolo did not specifically recall asking Conrad why he had not mentioned these facts at petitioner's trial. (*Id.* at 69.) However, Rufolo stated that he attributed Conrad's inconsistent statements to his brain injuries, and that, based on his involvement with Conrad, "he was much improved by the time of the *Williams* trial, both in terms of what he remembered and his ability to communicate what he remembered." (*Id.* at 69–70.)

Petitioner called former New York City Police Detective Robert Krause as a final witness in support of the CPL § 440.10 motion. Krause had been assigned to investigate the attempted murder of Conrad. (*Id.* at 84–85, 103–04.) Krause testified that he had prepared police report DD–5 # 45, in which he recorded that during his investigation, he had obtained information indicating that Conrad was a drug seller. (*Id.* at 90.) According to Krause, this information came from a Mr. Loo, who was the boyfriend of Conrad's mother. (*Id.* at 104.) However, Krause stated that Mr. Loo never substantiated the information he provided, and that he never received any "personal ... definitive information" indicating that Conrad was involved in drug-related activities. (*Id.* at 103–05.) Krause also stated that when he interviewed Conrad regarding his abduction and attempted murder, he asked Conrad if he understood the nature of "the thing" that was demanded of him. (*Id.* at 96.) According to Krause, Conrad stated that he could never recall what this "thing" was. (*Id.*) Krause further testified that, although he was present when ADA Nathan and ADA Rufolo interviewed Conrad, he could not recall if either ADA had ever asked Conrad if he sold drugs. (*Id.* at 93.) Finally, Krause testified that he interviewed Conrad immediately before petitioner's trial, and that Conrad stated during this interview that he had gone to Tony Tuff's apartment before he was abducted on July 3, 1985. (*Id.* at 97–98.)

### 4. *The Denial of Petitioner's CPL § 440.10 Motion*

In a memorandum dated June 3, 1994, Justice Lipp denied Brown's motion to vacate the judgment of conviction. (Bruffee Aff. Ex. H.) With regard to Conrad's testimony, Justice Lipp found that Conrad had testified falsely when he denied being involved in drug-related activities. (*Id.* at 13.) Justice Lipp reasoned that, because Conrad's admission of his drug involvement at the *Williams* trial was against his penal interest and was likely to affect his credibility, "he had no reason to make such an admission unless it was truthful." (*Id.*)

Justice Lipp next found that neither ADA Nathan nor ADA Rufolo were aware that Conrad's testimony regarding his lack

of any involvement with drugs was false at the time he gave it during petitioner's trial. In this regard, Justice Lipp stated as follows:

> Although they both possessed DD–5 # 45 (a police report prepared by Detective Krause that contained an unsubstantiated statement by the boyfriend of Conrad Tullonge's mother that tied Conrad Tullonge to drug dealing) the prosecution reasonably chose to accept Conrad Tullonge's direct denial of narcotics involvement. Although Assistant District Attorney Mark Rufolo later learned that Conrad Tullonge had testified falsely, he did not learn this until ten months after defendant was sentenced, during the trial of Patrick Williams.

(*Id.* at 13–14.) Thus, Justice Lipp held that petitioner had failed to meet his burden of showing prosecutorial knowledge of Conrad's false testimony. (*Id.* at 14.)

Justice Lipp went on to state in the alternative that, even if Rufolo had been aware that Conrad gave false testimony regarding his drug-related activities, petitioner failed to demonstrate that the testimony was "material, relevant, and not rendered harmless by all the evidence presented in the case." (*Id.* at 15.) Justice Lipp first noted that Conrad's falsehood bore only on his credibility rather than directly on petitioner's guilt. (*Id.* at 15.) Second, Justice Lipp stated there were substantial other evidence linking petitioner to the crimes for which he was convicted, including Tullonge's unchallenged testimony, the testimony of Junior Nugent, the testimony that petitioner abducted Conrad at gunpoint, and ballistics evidence tying all the crimes together. (*Id.* at 15–16.) Third, Justice Lipp concluded based on all the evidence presented at trial that the jury could easily have inferred that drugs served as the motive for the killings, and that defense counsel could have argued on summation that drugs were indeed involved. (*Id.* at 16.) In support of this conclusion, Justice Lipp pointed to the evidence that drugs were

found in the Tullonges' apartment, that the brothers had been involved with drugs, and that Conrad had been abducted by petitioner so that petitioner could get his "thing" back. (*Id.*) Based on the foregoing factors, Justice Lipp concluded that Conrad's false testimony regarding his drug dealing did not prejudice petitioner's case and that, because the falsity was not a material issue in the case, any error was harmless beyond a reasonable doubt. (*Id.*)

Addressing petitioner's claim that Conrad had testified falsely when he did not mention having visited petitioner's home on the day before he was shot (and being allowed to leave voluntarily), Justice Lipp held that petitioner failed to demonstrate that Conrad's testimony was false. Justice Lipp noted initially that "there is no basis in law to conclude that this omission can constitute false testimony." (*Id.* at 17.) Justice Lipp next found that, even assuming that an omission could constitute false testimony, petitioner had failed to demonstrate that the omission could be considered an inconsistent statement capable of being used for impeachment. (*Id.*) Justice Lipp then stated that the defendant had failed to establish which testimony—that given at petitioner's trial or that given at the *Williams* trial—was false, because unlike the drug-related testimony given at the *Williams* trial, Conrad's testimony that he visited petitioner's home on the night of shooting was not a statement against penal interest and would not adversely affect his credibility. (*Id.* at 17–18.) Finally, Justice Lipp held that even if petitioner had shown that the testimony given at petitioner's trial was false, such testimony was "collateral to any issue in the case, and was harmless or immaterial" for the same reasons that Conrad's false testimony regarding his drug involvement was harmless or immaterial. (*Id.* at 18.) Accordingly, Justice Lipp denied the motion for a new trial. (*Id.*)

E. *Petitioner's Direct Appeal*

On November 21, 1994, the Appellate Division, Second Department, granted petitioner permission to appeal the denial of his CPL § 440.10 motion, and consolidated that appeal with his direct appeal. (Pet. Mem. at 26.) On grounds unrelated to the present petition, the Appellate Division reversed petitioner's conviction of three counts of murder in the first degree, four counts of criminal possession of a weapon, two counts of assault in the first degree, and one count of robbery in the first degree. *People v. Brown*, 230 A.D.2d 917, 918, 647 N.Y.S.2d 26 (2d Dep't 1996). Specifically, with regard to petitioner's conviction on the murder, robbery and assault charges, the Appellate Division found that the trial court had, without defense counsel's consent, annotated the verdict sheet with the statutory elements of each charge. *Id.* Applying *People v. Damiano*, 87 N.Y.2d 477, 640 N.Y.S.2d 451, 663 N.E.2d 607 (1996), the Appellate Division thus vacated the convictions of those counts. 230 A.D.2d at 918, 647 N.Y.S.2d 26. Moreover, because four of the counts of criminal possession of a weapon were factually related to the murder, robbery and assault charges in that they each alleged that petitioner criminally possessed a weapon when he committed those crimes, the weapons convictions were vacated as well. *Id.*

Turning to petitioner's appeal of the denial his CPL § 440.10 motion, the Appellate Division denied this appeal summarily, stating only that "[t]he defendant's contention that the prosecutor failed to correct false testimony given by one of his witnesses is without merit." *Id.* at 919, 647 N.Y.S.2d 26 (citations omitted).

In an order dated December 9, 1996, Judge Bellacosa of the New York Court of Appeals granted petitioner leave to appeal from the Appellate Division's orders. *People v. Brown*, 89 N.Y.2d 919, 654 N.Y.S.2d 721, 677 N.E.2d 293 (1996). The Court of Appeals first affirmed the Appellate Division's decision to vacate the convictions for murder, robbery, assault, and criminal possession of a weapon. According to the Court of Appeals, because the Appellate Division's finding that petitioner did not consent to the annotation of the verdict sheet reflected a factual determination based on competing inferences in the record, the decision to vacate the convictions was not subject to challenge. *People v. Brown*, 90 N.Y.2d 872, 874, 661 N.Y.S.2d 596, 684 N.E.2d 26 (1997). The Court of Appeals next affirmed the Appellate Division's denial of the CPL § 440.10 motion as to the surviving convictions. With regard to petitioner's claims that Conrad's false testimony warranted the reversal of these convictions, the Court of Appeals stated as follows:

> We likewise agree with the Appellate Division's rejection, as meritless, of defendant's claims in his CPL § 440.10 motion that his conviction should be vacated because the prosecution did not disclose the possible falsity of certain testimony of a People's witness, only discovered when that witness testified at a trial subsequent to that at bar.

*Id.* at 875, 661 N.Y.S.2d 596, 684 N.E.2d 26. This petition followed.

## DISCUSSION

A. *The Nature of Petitioner's Claims*

As discussed, Brown asserts three grounds in support of the present petition. First, Brown argues the prosecutor violated his continuing obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Brown argues that during the *Williams* trial, which took place ten months after Brown was convicted, the prosecutor became aware of two pieces of material evidence favorable to Brown's defense: (1) that the Tullonges had been involved in the drug trade prior to the shootings of July 3, 1985; and (2) that Conrad had visited Tony Tuff's apartment on July 2, 1985 and had been allowed to leave unharmed. According to Brown, the prosecutor violated

*Brady* when he did not inform Brown of the substance of Conrad's subsequent testimony until approximately two years after the *Williams* trial had ended. Second, Brown contends that his due process rights were violated by the prosecutor's failure to correct Conrad's false testimony as soon as the prosecutor learned of it. Finally, Brown asserts that his conviction was so heavily predicated upon false testimony as to violate his due process rights.

Although Brown presents these arguments as separate claims, and there are some superficial differences between them, there is only one issue at the heart of this petition: whether newly-discovered evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In determining that petitioner has, in effect, asserted only a single claim for habeas relief, I rely on the following considerations. First, although petitioner correctly contends that a prosecutor's obligations under *Brady* continue after a defendant has been tried and sentenced,[15] he has

failed to establish that he suffered any prejudice as a result of the gap between the time the prosecutors heard Conrad's testimony at the *Williams* trial and the time petitioner became fully aware of the precise nature of that testimony.[16] At bottom, then, the *Brady* claim is premised on the argument that Conrad's subsequent testimony undermines the validity of petitioner's conviction.

Second, although petitioner describes his second basis for habeas relief as a due process violation resulting from the failure of the prosecutors to correct Conrad's false testimony, petitioner acknowledges that the prosecutors did not become aware of the falsity of that testimony until the *Williams* trial, approximately ten months after petitioner's trial had ended. (Pet. Mem. at 45–46.) Thus, this is not a case in which prosecutors knowingly procured perjured testimony, or knowingly allowed perjured testimony to go uncorrected at trial. Also, as mentioned, there is no viable claim that petitioner suffered prejudice from the delay in learning the nature of Conrad's subsequent testimony. Instead,

---

**15.** *See, e.g., United States v. Seijo*, 514 F.2d 1357, 1362–63 (2d Cir.1975) (using *Brady* standard of materiality to determine whether testimony given at defendant's trial, testimony which prosecutors only later discovered was false, warranted a new trial).

**16.** The only argument petitioner makes in this regard actually relates to petitioner's second claim, and is stated as follows: "[h]ad the prosecutor properly fulfilled his constitutional obligations to correct false testimony when he became aware of it in October, 1987, petitioner could have attacked his conviction on these grounds two years earlier." (Pet.Mem. at 48–49.)

However, petitioner does not challenge respondent's contention that the testimony at the *Williams* trial was under seal, and that both petitioner and respondent would have been required to obtain an unsealing order before that testimony could have been released. More importantly, petitioner also does not answer the argument that he was just as capable as the prosecutor of moving for an unsealing order because, as he candidly admits, "someone informed [him] soon af-

ter Williams was acquitted that Conrad's testimony at Williams' trial was inconsistent with his testimony at petitioner's trial." (Pet.Mem. at 28.) Finally, whatever delay there may have been in the prosecutor's disclosures did not preclude petitioner from making any substantive arguments in his state-court motions for post-conviction relief. Petitioner's counsel has not contended otherwise. At oral argument, she merely reiterated, in essence, that the only prejudice from the delay was that "my client was sitting in prison." (Transcript of Oral Argument, Dec. 4, 1998, at 5.)

In highlighting the foregoing facts, it is not my intention to intimate approval of the prosecutor's conduct. Petitioner's counsel should have been notified that Conrad's testimony regarding drug-dealing was false as soon as the prosecutor became aware of the falsity. That should have occurred, at the latest, during the *Williams* trial, before the record of that case was sealed. However, regardless of whether petitioner was prejudiced by the false testimony given at his trial, he suffered no distinct prejudice from the prosecutor's failure to disclose immediately the contradictory testimony given at the *Williams* trial.

the essential argument is that if Conrad had testified regarding his drug-related activities at petitioner's trial in the manner he testified during the *Williams* trial, there is a significant chance that Brown would have been acquitted. As a result, petitioner's second argument is merely a subset of his first argument under *Brady*, which was based on false testimony and newly discovered evidence of the visit to petitioner's home. Accordingly, the merits of the second argument depend entirely on the merits of the first.

Third, petitioner's final argument—that his conviction was "so heavily predicated on false testimony" that the conviction alone violates due process—does not require the application of distinct legal standards or analysis. This claim depends, as does the second claim, on determining the likelihood that the jury would have acquitted petitioner if it knew that Conrad's testimony was false.

For these reasons, rather than assessing each of Brown's arguments separately, I will focus on whether knowledge that Conrad testified falsely, coupled with evidence of his earlier visit to petitioner's apartment, "could reasonably be taken to put the whole case in such a different light as to undermine confidence" in the jury's verdict. *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555.

B. *The Materiality of the False Testimony and the Evidence of the Earlier Visit to Petitioner's Apartment*

1. *General Standards*

■ · In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. Under *Brady,* a new trial is warranted when (1) the government failed to disclose evidence

favorable to the defense; and (2) the suppressed evidence was material. *United States v. Wong,* 78 F.3d 73 (2d Cir.1996) (citing *United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995)).

■ When the government uses perjured testimony in obtaining a conviction, a court must first look to the surrounding circumstances to determine the standard of materiality that applies. "Where ... there was neglect, rather than prosecutorial misconduct, a higher standard of materiality is required." *United States v. Seijo,* 514 F.2d 1357, 1364 (2d Cir.1975). Under circumstances indicating neglect, "the test 'is whether there was a significant chance that this added item, developed by skilled counsel ... could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction.' " *Id.* (quoting *United States v. Sperling,* 506 F.2d 1323, 1333 (2d Cir.1974)); *see also United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975) (inadvertent but negligent failure of prosecutor to disclose evidence that is of exculpatory or impeaching nature "loosens the standard of review" and require reversal only if there is a "significant chance" that the new evidence could have created a reasonable doubt), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976). By contrast, when prosecutorial misconduct is present, or the prosecution has knowingly made use of perjured testimony, "the standard for materiality is reduced to a showing of 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *United States v. Gambino,* 59 F.3d 353, 365 (2d Cir.1995) (quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996).

■ "[A] different standard applies for cases not involving the use of perjured testimony, but simply the withholding of evidence that would tend to exculpate a defendant." *United States v. Petrillo,* 821 F.2d 85, 88 (2d Cir.1987). In *Agurs,* the Supreme Court held that a conviction

should be overturned in such circumstances only "if the omitted evidence creates a reasonable doubt that did not otherwise exist." 427 U.S. at 112, 96 S.Ct. 2392. In other words, this standard requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

In applying these standards to the present case, I will consider the materiality of Conrad's testimony at the *Williams* trial that he had visited petitioner's apartment on the night before the shooting and been allowed to leave unharmed, as well as the materiality of the false testimony Conrad gave at petitioner's trial. Although my analysis of this evidence is set forth in separate sections, I have considered the evidence "collectively, not item by item." *Kyles*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490. In so doing, I find that there was no *Brady* violation, and that a new trial is not warranted.

### 2. The Earlier Visit to Petitioner's Apartment

■ As discussed, during the *Williams* trial, Conrad testified that he had voluntarily visited petitioner's apartment on July 2, 1985, before being abducted, and was permitted to leave. (Williams Tr. 184.) Specifically, Conrad stated that he arrived at petitioner's apartment at approximately 8:45 or 8:50 p.m., that petitioner was not home, and that Conrad spoke with one individual named Richie and another individual he did not know. (Williams Tr. 196.) Conrad testified that no one asked him about the "stuff" or the "thing," and that although he was asked to stay until petitioner returned, he announced that he was leaving, and was permitted to depart without any resistance. (Williams Tr. 196–201.)

According to petitioner, Conrad's testimony regarding his earlier visit to petitioner's apartment is "favorable evidence"

subject to government disclosure under *Brady*. In support of this argument, petitioner states that evidence of the visit.

> not only revealed Conrad's drug involvement but directly contradicted [witness Michael] Lewis' claims at petitioner's trial that Conrad was abducted on the night of the attempted murder and murders since it is incredible that Conrad would voluntarily visit Tuff's apartment, leave unharmed, and then only hours later be abducted and brought right back.

(Pet.Mem. at 41.)

■ I disagree with the claim that this evidence was favorable to the defense. Evidence is favorable only if it would tend to exculpate a defendant or reduce the penalty he faces. *Lamberti v. United States*, 22 F.Supp.2d 60, 69 (S.D.N.Y.1998) (citing *Brady*, 373 U.S. at 88, 83 S.Ct. 1194). Here, nothing about Conrad's testimony at the *Williams* trial tended to exculpate petitioner, as petitioner was not even present when Conrad arrived, and there is no indication that petitioner had instructed Richie or the other man to permit Conrad to leave. As for petitioner's conclusory assertion that it is "incredible" that Conrad would be allowed to leave and then would be abducted later the same evening, I fail to find anything so incredible in those facts, let alone anything that would tend to establish petitioner's innocence.

In any event, even if Conrad's earlier visit to petitioner's apartment did represent favorable evidence, I find that (whether taken alone or in viewed together with Conrad's false testimony) it would not have "create[d] a reasonable doubt that did not otherwise exist." *Agurs*, 427 U.S. at 112, 96 S.Ct. 2392. As discussed in greater detail below, there was substantial other evidence of petitioner's guilt, including testimony from Michael Lewis that he saw petitioner abduct Conrad at gunpoint early the following morning. Nothing about the visit to petitioner's apartment the night

before directly contradicts Lewis's testimony, and the evidence of such a visit leaves untouched all of the other inculpatory testimony presented against petitioner. Accordingly, I reject petitioner's claim that this evidence warrants a new trial.[17]

### 3. Conrad's False Denial of His and the Tullonges Drug–Related Activities

More significant than Conrad's visit to petitioner's apartment is Conrad's false denial that he was involved with drugs at the time of shootings, and it is on this evidence that petitioner focuses the majority of his arguments.

### a. The Nature of Conrad's False Testimony

■ Although exculpatory evidence and impeachment evidence both fall within the *Brady* rule, *see Bagley*, 473 U.S. at 676, 105 S.Ct. 3375, petitioner repeatedly contends that Conrad's drug dealing bore directly on petitioner's guilt, and that the state court was wrong when it found Conrad's lies bore only on his credibility as a witness. Specifically, petitioner asserts that

> Conrad's false denials that he and his family were involved in drugs and that he had traveled to Florida to buy cocaine just days before the murders and attempted murder effectively nullified counsel's argument before the jury that the real killers in the car with Florida plates were hit men sent by the Florida drug dealer from whom Conrad, Paul

Tullonge and Roger Bigelow had recently stolen drugs and money.

(Pet.Mem. at 36.)

The notion that Conrad's false testimony somehow undermined an otherwise viable defense theory that the true perpetrator was a Florida hit man hired to kill the entire Tullonge family over a drug rip-off is not only meritless, but absurd. During his opening statement, petitioner's counsel referred several times to the fact that Conrad was abducted by four individuals who had emerged from car with Florida license plates. (Tr. 25, 27, 34–35.) Defense counsel also told the jury that the murders and attempted murder were "drug related, by a syndicate, by a gang, hit men, four of them in a car, Chrysler with Florida plates." (Tr. 34–35.)

An examination of all the evidence presented at petitioner's trial, however, reveals virtually no support for petitioner's Florida hit-man defense. The only evidence even remotely related to the theory was Michael Lewis's testimony that on the morning of July 3, 1985, he saw four men in a gray Chrysler with Florida plates abduct Conrad at gunpoint from the doorway to his apartment and put him in the back of the car. (Tr. 184–85, 206–07.) Of course, that the men who abducted Conrad exited from car with Florida plates does not establish that they were hit men hired by an unknown Florida drug dealer, especially when Lewis's uncontroverted testimony established that petitioner himself was one of the men who emerged from the car and abducted Conrad.[18] (Tr. 192.)

---

17. I further note that a defendant cannot show that the government suppressed favorable evidence if the defendant "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983) (citations omitted).

Here, assuming (as petitioner does) that Conrad's testimony regarding his visit to petitioner's apartment was truthful, petitioner either knew or should have known of that visit at the time of his trial. According to Con-

rad's testimony, petitioner had told Lance to have Conrad come to the apartment; Richie was present in the apartment when Conrad arrived; and, based on the events of later that evening, Richie and petitioner were accomplices. Presumably, then, petitioner would have been able to inform his attorney that Conrad had visited the apartment earlier that evening and departed unharmed. Thus, petitioner is unable to argue that the evidence of Conrad's visit was "suppressed."

18. Lewis also testified that about ten or fifteen minutes later, petitioner and three others returned in the gray Chrysler with Florida

During his closing arguments, petitioner's counsel marshaled the meager evidence in support of the Florida hit-man theory as follows:

> This was an execution. Plain and simple. These four men driving up with Florida plates. And we know, you have your common sense. You know what Florida means to the drug capital of our America. It's a scorch. It's a shame. It's a tragedy. But we do know that there was a gray Chrysler.

(Tr. 1014.)

Petitioner now asserts that it was Conrad's false testimony that undermined the defense. He contends that if Conrad had testified about his drug dealings in the manner he had at the *Williams* trial, the hit-man theory would have been convincing to the jury. I disagree. Conrad's testimony at the *Williams* trial provided no support for the defense theory of the case. Conrad conceded at the *Williams* trial that he had made two trips to Florida for the purpose of buying drugs. As detailed earlier, Conrad stated that he took one such trip with an individual named Bobby Reds, and that he made the other trip himself. (Tr. 158–59.) However, when Williams' counsel asked whether Conrad had ever ripped off a drug dealer in Florida, Conrad denied it, and there was no evidence to the contrary.[19] (Tr. 160.) Because no reasonable jury could have viewed Conrad's testimony at the *Williams* trial as supporting the notion that a Florida hit man rather than petitioner was the true perpetrator, I share Justice Lipp's view that Conrad's testimony at the *Williams* trial was impeachment evidence only.

plates to the spot from which Conrad had been abducted. (Tr. 196.) Lewis stated that petitioner had blood on his shirt and was carrying a gun, that petitioner and the others went into the Tullonges' apartment, and that when the four men came out of the apartment about ten or fifteen minutes later, another of them besides petitioner had blood on his shirt. (Tr. 196–201.)

b. *The Standard for Assessing the Materiality of Conrad's False Testimony*

It is difficult to set forth a definitive standard that governs the materiality of Conrad's false testimony. In *United States v. Wong,* 78 F.3d 73 (2d Cir.1996), a recent Second Circuit decision regarding the materiality of impeachment evidence, the court of appeals stated as follows:

> Evidence of impeachment is material if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case. However, new impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable. In sum, a new trial is warranted only if the evidence is material, noncumulative, and would probably lead to an acquittal.

*Id.* at 79 (internal quotation marks and citations omitted).

Other decisions have used a slightly different formulation for assessing whether false testimony represents material evidence in the context of *Brady.* In *United States v. Gambino,* 59 F.3d 353 (2d Cir. 1995), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996), the Second Circuit stated that when false testimony is relied upon in the government's case or prosecutorial misconduct was present, "the standard for materiality is reduced to a showing of 'any reasonable likelihood that the false testimony could have affected the

**19.** In response to further questions from Williams' attorney, Conrad also testified that he had not ripped off a drug dealer in Brooklyn (Tr. 161–62), and denied ever robbing anyone. (Tr. 162.)

judgment of the jury.'" *Id.* at 365 (quoting *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). Otherwise, where there was merely neglect rather the prosecutorial misconduct, "a higher standard of materiality is required." *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir.1975). Under circumstances of neglect, "the test 'is whether there was a significant chance that this added item, developed by skilled counsel ... could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction.'" *Id.* at 1364 (quoting *United States v. Sperling*, 506 F.2d 1323, 1333 (2d Cir.1974)).

Here, in ruling on petitioner's motion pursuant to CPL § 440.10, Justice Lipp explicitly found that neither ADA Rufolo nor ADA Nathan knew at the time of petitioner's trial that Conrad was lying when he denied his involvement in drug-related activities. (Bruffee Aff.Ex. H at 13–14.) This factual determination must be presumed correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The petitioner has not challenged the state court's finding in any way. Accordingly, the appropriate standard for determining the materiality of the evidence appears to be whether "there was a significant chance that this added item, developed by skilled counsel ... could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Seijo*, 514 F.2d at 1364.

### c. Application of the Materiality Standard to Conrad's False Testimony

▮ Regardless of the precise standard employed, a careful review of the entire transcript reveals that petitioner has failed to establish the materiality of Conrad's false testimony. The likely impact of the impeachment evidence here—*i.e.*, that Conrad lied when he denied that he and the Tullonges were involved with drugs—is minimal, and does not relate to a critical issue of the prosecution's case. Moreover, even if the impeachment evidence would have prompted a jury to reject all of Conrad's testimony, there was still powerful independent evidence that would lead the jury to convict. Accordingly, evidence of Conrad's false testimony would not have changed the outcome of the case, and a new trial is not warranted.

### i. The Impact of the Impeachment Evidence

Throughout his submissions, petitioner contends that evidence of the drug-dealing activities of Conrad and the Tullonges—and the knowledge that Conrad lied about these activities—would have had a tremendous impact on the weight afforded Conrad's testimony. For example, petitioner asserts that "[s]killed counsel could not only have decimated Conrad's credibility had his outright lies been made known to the jury, but could have exposed the drug connections among all the prosecution witnesses." [20] (Pet.Mem. at 40.) Petitioner

---

**20.** Petitioner's contention that the jury would have learned of "drug connections among all the prosecution witnesses" requires only brief discussion. In his memorandum of law, petitioner develops this argument as follows:

Conrad's truthful testimony about his drug dealings gave both Conrad and [Michael] Lewis motives to falsely accuse petitioner. Conrad and Lewis knew each other and both knew Roger Bigelow, another Brooklyn drug dealer who reportedly traveled with Conrad and Paul Tullonge to Florida to buy cocaine, and who coincidentally steered Lewis to the Tullonge apartment moments before the murders and then stole money and guns from the apartment once the Tullonges were dead. The truth about Conrad's drug dealings—which connected the Tullonges, Roger Bigelow, and by implication Michael Lewis, to the Florida drug dealer defense counsel contended was the real killer—may well have strengthened the jury's assessment of the crucial defense theory, thereby raising reasonable doubt.

(Pet.Mem. at 38–39.)

This argument is without merit, as nothing in Conrad's testimony during the *Williams* trial, nor any evidence presented in petitioner's trial, gave even the slightest indication that a conspiracy existed to frame petitioner.

further argues that the "[t]he truth about the Tullonge's drug dealings could have altered the entire texture and focus of the case," and would have made the case "appear[ ] less an act of random violence than the product of the victims' and the prosecution witness' nefarious activities." (Pet. Mem. at 36–37 (internal quotation marks omitted).) In other words, petitioner suggests that if the jury had learned about Conrad's lies, it would have understood for the first time that drugs played an integral role in the charged crimes, and would have completely reassessed Conrad's credibility.

It is inconceivable that any rational juror could have understood the crimes in this case to have been acts of "random violence." The record was replete with indications that Conrad and the Tullonges were involved with drugs, and the jury was undoubtedly well aware that Conrad had lied when he testified otherwise. Several examples bear mentioning. First, during opening arguments, defense counsel ensured the jury that it would learn that Paul, Lance and Rohan Tullonge were drug dealers. Although defense counsel asserted that some of this evidence would come from "the prosecutor's own witnesses," he also assured the jury that police investigations would provide further evidence that the murders and attempted murders were the result of drug-related activities:

> Now, the evidence will show this, that those three young men who were shot, God rest their souls in peace, were nothing but cocaine dealers, dealing heavily. The evidence will show that. Not by independent proof, but by the prosecutor's own witnesses, the investigation that was conducted by the Police De-

partment and the detectives and informal—or confidential informants. There was a tremendous investigation on this. Three murders, executed.

\* \* \* \* \* \*

> [T]hey were dope dealers, dealing in cocaine. Investigations will show that they went down to Florida to get a kilo of cocaine and they robbed $50,000, and the man that they thought they killed didn't die. He sent his buddies up here as hit men.

\* \* \* \* \* \*

> What you have here, ladies and gentlemen, is a tragedy that will reveal itself on the witness stand by the officers, independent parties. Not by people coming in. All of these people are going to testify. Mr. McLain [sic], Mr. Lewis and whoever else is going to come in. They're all together selling that dope. Peddling that dope. No means of income.

(Tr. 24–25, 27.) Petitioner's attorney also stressed for the jury that the very nature of the killings suggested that the Tullonges had been involved with narcotics:

> This is drug related. These are brutal, ghastly executions. All four people tied, and three did die with their hands tied behind their back. One on the bed, and two on the floor, and nobody hears anything. Nobody. Nobody hears anything.

(Tr. 33.)

Numerous pieces of evidence presented during trial provided the jury with a substantial basis for believing that Conrad and his relatives were involved with nar-

Although Michael Lewis testified that he knew Conrad, he stated that the two met playing basketball, rather than through any drug-related activities (Tr. 184), and there is no evidence (other than that which petitioner creates "by implication") that Lewis was connected to Conrad's drug dealings. The defense theory that a hit man was the real killer has already been shown to be wholly lacking in evidentiary support. Finally, petitioner's

claim that Roger Bigelow "reportedly" accompanied Conrad and Paul Tullonge on a drug trip to Florida is sheer speculation, and even in the *Williams* trial, when Conrad admitted being engaged in drug-related activities, Conrad stated only that he knew Roger Bigelow, not that he ever traveled to Florida or committed a drug rip-off with him. (Williams Tr. 159.)

cotics, and that the shooting resulted from that involvement. For example, Michael Lewis testified that, after the armed men who had abducted Conrad (including petitioner) left the Tullonge apartment, an individual named Roger Bigelow went into the apartment, emerged with his pockets full of money, and said that the people inside the apartment were dead.[21] That the men who entered the Tullonge apartment did not bother to steal money, but rather seemed intent on simply murdering everyone inside, almost certainly indicated to the jury that the killings were motivated by factors other than robbery and that these were anything but crimes of random violence.

Counsel for the defense also raised the issue of the victims' drug involvement during his cross-examination of Detective Robert Krause, the police officer who investigated the shootings. Krause testified as follows:

Q: As a result of your investigation, sir, did you learn that the three brothers were dealing heavily in drugs?

A: They were dealing drugs. I don't know how heavy it was, or if it was heavy.

Q: But they were selling?

A: That is correct.

(Tr. 402.) In addition, on the second day of his testimony, Krause stated that contraband had been found in the Tullonges'

apartment and was vouchered. (Tr. 508.)[22]

The summations included several references to the drug dealings of the Tullonges. Defense counsel stated that "we know from Krause that there [were] drugs involved here" (Tr. 1013), and recapitulated Krause's testimony that while he did not know how heavily the Tullonges were involved with narcotics, he knew that they were dealers. (Tr. 1021.) Petitioner's trial counsel also referred to Conrad's testimony that, upon being abducted, he was repeatedly asked for the "thing." Defense counsel described the abduction, and told the jury what it should conclude from the references to the abductor's "thing":

[H]e can still remember everything that happened in that apartment as Tony Tough being there, Richie being there. Coconut being there.

Now, he says that very clearly, and he indicated, "Don't. Leave my brother alone. Here, take my keys. Where is my thing."

Ladies and gentlemen, I guess you can draw the inference, the thing must be contraband. It must be drugs. Where is my thing.

(Tr. 1032.) Importantly, Rufolo did not attempt to convince the jury that Conrad and the Tullonges were not drug dealers. Instead, Rufolo acknowledged that drugs had been found in the Tullonge apartment,[23] and indicated that a drug dispute

---

21. During trial, defense counsel occasionally suggested that Roger Bigelow was the actual killer. However, that argument is not present in any of the submissions before me, and petitioner appears to have abandoned it.

22. This testimony appeared to be in conflict with testimony that Krause had given the prior day. Specifically, defense counsel asked Krause whether a white substance had been found on the night table in the Tullonges' apartment. (Tr. 425a.) Krause responded that a white substance had been discovered on a chest of drawers, that it turned out not to be contraband, and that he did not know whether it was a mixing powder. (Tr. 425a–426.)

On the second day of his testimony, after Krause testified that contraband had indeed been found in the apartment, defense counsel inquired why Krause had not revealed that fact on the day before. Krause responded that neither the prosecutor nor the defense attorney had asked. (Tr. 508.)

23. Notwithstanding this acknowledgment, I am troubled by one aspect of ADA Rufolo's conduct. Whereas Conrad had testified that drugs were never present in the Tullonge apartment, ADA Rufolo stated on summation that "Conrad told you that Paul did have some drugs in the apartment." (Tr. 1078.) By attributing testimony regarding the presence of drugs to Conrad, ADA Rufolo—either intentionally or inadvertently—may have im-

may have been the motivating factor behind the shootings:

> There's a confrontation, because the defendant wants his things. What is his thing? I don't know. Could it have been drugs? Could have been. Could it have been something else? Could have been. It doesn't matter.

(Tr. 1083.)

Based on the evidence and the arguments set forth above, I reject petitioner's claim that the jury would have viewed this case and Conrad's credibility in a new light if he had admitted his involvement in drugs. Even without that admission, the record provided the jury with a strong basis to suspect—perhaps even to know—that Conrad had lied when he disavowed such activities. In addition, to the extent there is any validity to the notion that the jury would have been even slightly surprised that Conrad and the Tullonges were involved in drug-dealing, such evidence related to an issue that was collateral to petitioner's guilt.

Because I conclude that the jury already knew or, at least, strongly suspected that Conrad had lied when he denied his drug involvement, I find that confirmation of that fact would not have had any substantial impact on Conrad's credibility, nor would it have given rise to "a significant chance that this added item, developed by skilled counsel ... could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Seijo*, 514 F.2d at 1364 (quoting *United States v. Sperling*, 506 F.2d 1323, 1333 (2d Cir. 1974)).

### ii. The Independent Evidence of Petitioner's Guilt

Even assuming that the jury would have rejected all of Conrad's testimony upon learning that he was not truthful about his and his relatives' involvement with narcotics, petitioner would still fail to establish

that he is entitled to a new trial, because Conrad's testimony was far from the only evidence linking petitioner to Conrad's shooting. Indeed, even setting aside all of Conrad's testimony, there was ample evidence from which a jury could have found that petitioner abducted Conrad and attempted to murder him.

During the course of the trial, the prosecution presented numerous pieces of evidence that corroborated Conrad's testimony and provided powerful, independent evidence of petitioner's guilt. As discussed, Michael Lewis testified that he saw petitioner abduct Conrad at gunpoint at approximately 5:30 a.m. on July 3, 1985. (Tr. 181, 184, 189–90.) Emmons Trim testified that at approximately 6:10 a.m. that same day, he found Conrad staggering down the street while bleeding from the face and head. (Tr. 165.) Officer Scott Curcio asked Conrad what had happened, and Conrad answered that he had been shot by someone he identified as "Tuff." (Tr. 276, 299.) Officer Curcio also testified that when he attempted to lift Conrad's head off the hood of a car, he heard a "ping" and discovered that a bullet was rolling down the hood. (Tr. 276–77.) Detective Anthony Tota of the police department's ballistics squad testified that, based on bullet comparisons, the same .38 caliber handgun had been used to shoot Conrad, Lance, Rohan and Paul Tullonge, and that this was also the gun used to shoot Junior Nugent. (Tr. 834–37.) Junior Nugent in turn testified that it was petitioner who shot him (Tr. 111, 113–14), and that testimony was corroborated by Michael McLean. (Tr. 50.) Both Nugent and McLean also identified petitioner as the man they knew as "Tony Tuff." (Tr. 47, 111–12.) Taken together, this evidence provides compelling proof of petitioner's guilt, proof that is indepen-

---

properly bolstered Conrad's credibility in the minds of the jury. Nonetheless, petitioner does not complain of prosecutorial misconduct in this regard, and any error was harm-

less, as the trial court instructed the jury that its own recollection of the facts was controlling regardless of what counsel stated in arguments. (Tr.2003.)

878

dent of any taint that may have attached to Conrad's testimony.

Accordingly, I find that knowledge of Conrad's false testimony, even when coupled with the previously undisclosed evidence that he visited petitioner's apartment and was permitted to leave on the same day of the shooting, would not have affected the judgment of the jury.

### CONCLUSION

For the reasons set forth above, the petition is denied. In addition, I refuse to issue a certificate of appealability, because petitioner has not presented a "substantial showing of the denial of a constitutional right." *See Reyes v. Keane*, 90 F.3d 676, 680 (2d Cir.1996) (quoting Section 102 of the AEDPA).

So Ordered.